187 So. 35

**VINCENT et al. v. BULLOCK et al.**

No. 35088.

Jan. 10, 1939.

Rehearing Denied Feb. 17, 1939.

Porteus R. Burke and Jacob S. Landry, both of New Iberia, and E. B. Dubuisson, of Opelousas, for appellants.

Walter J. Burke and James L. Helm, both of New Iberia, for appellees.

Cullen R. Liskow, W. W. Thompson, Austin W. Lewis, and S. W. Plauche, all of Lake Charles, amici curiæ.

FOURNET, Justice.

This is an action in jactitation or slander of title. The object of the suit is to annul and cancel from the conveyance records of Iberia Parish a certain instrument dated March 1, 1937, whereby the defendants F. N. Bullock and Laura Jacobs Bullock sold and assigned to the other defendant, W. W. Smith, a certain portion of a mineral royalty interest which had been reserved by plaintiffs in their deed to C. W. Wolke, an interposed party, for F. N. Bullock, dated February 22, 1927.

Joseph Gajan, James Kappas, and Arthur E. Schott, each having acquired an interest in the royalty reserved by plaintiffs, intervened and joined plaintiffs in this action.

The defendants admitted the execution of the instrument in controversy but denied all the other allegations of plaintiffs and intervenors, and pleaded the prescription of ten years liberandi causa.

There was judgment in the lower court maintaining defendants' plea of prescription, and dismissing plaintiffs' and intervenors' suit at their cost and they have appealed.

On February 22, 1927 plaintiffs executed a deed in favor of C. W. Wolke, transferring three contiguous tracts of land

of ten acres each in Iberia Parish for a cash consideration of $1,800, in which was contained the following stipulation:

"It is however, understood and agreed that the vendors herein reserve unto themselves and their heirs and assigns, in perpetuity, a one-sixteenth (1/16th) royalty of all the oil, gas and other minerals produced and saved from said premises; said royalty to be delivered to the vendors or assigns, free of cost of production and a royalty of twenty-five cents per ton for all salt and sulphur mined and marketed off said premises. This royalty reservation forms part of the purchase price."

It is conceded that C. W. Wolke, in acquiring the property from plaintiffs, was an interposed party for the defendant F. N. Bullock and, accordingly, on September 15, 1928, he (C. W. Wolke) transferred the property to the defendant F. N. Bullock, subject to the reservation made by plaintiffs and without warranty of title. On June 17, 1935 he (F. N. Bullock) transferred the same property (with other properties) to his wife and co-defendant, Laura Jacobs Bullock. On March 1, 1937, Laura Jacobs Bullock and F. N. Bullock, by act executed before a notary public in Houston, Texas, sold and assigned to defendant W. W. Smith a "* * * 13/40th of the 1/8th royalty, or in other words a 13/320 interest in all oil and gas and other minerals produced * * *." In this deed is contained the declaration by Laura Jacobs Bullock "* * * that there has never been any development or drilling for oil, gas or other minerals on said properties from the date of said sales and royalty reservations

* * *." The recited consideration in the act is $500 in cash and also contains the following covenant:

"This assignment is delivered by Vendor Bullock and accepted by Vendee Smith with the understanding and agreement that the royalty herein assigned is intended to be exclusively a part of the royalty reserved by the Vendors of the several tracts hereinabove referred to; and without in any manner, expressly or impliedly, recognizing the present validity of said reservations, Vendee herein, Smith, assumes the obligation of defending with the interest herein assigned, the interest retained by Vendor herein, Bullock, out of the royalty reservations now claimed by her, reserved by the said vendors of the Several tracts hereinabove referred to, with the stipulation that the said Smith shall not be liable for any claim for any refund or accounting which the said Vendor may be required to make."

The record further shows that of the 1/16th royalty reserved by plaintiffs in their deed to Wolke dated February 22, 1927, they, on the said date, sold and assigned 1/2 thereof to F. E. Delahoussaye and Joseph Gajan. F. E. Delahoussaye, on September 17, 1928, sold, from the interest acquired by him, to Arthur E. Schott, a one per cent mineral interest, and on April 7, 1938, sold the remainder of his interest to Joseph Gajan. Joseph Gajan sold and assigned one-half of the interest acquired by him from the plaintiffs on February 22, 1927, to James Kappas on December 31, 1936.

It is plaintiffs' contention that the reservation made by them in their deed to Wolke dated February 22, 1927, does not fall in the legal category of a servitude, subject to the prescription of ten years for non-use, but characterize it (1) as being in the nature of a rent charge to become operative should oil or other minerals be produced, (2) as being in the nature of a servitude contingent upon a future happening, i. e., the production of oil, gas, or other minerals, and (3) or as "* * * being in the nature of a purchase of real rights to come and not in esse, or real right based on an uncertain happening * * *." Intermingled with this contention, plaintiffs invoke the plea of custom with reference to the generally accepted construction of such a reservation as was made in the act in controversy, and the language therein used. In the final alternative it is contended by plaintiffs that should the court decree that the reservation made by them is subject to the prescription liberandi causa of ten years, that same was interrupted by the acts, stipulations, and acknowledgments of the defendants.

The issues involved in this case have never been squarely presented to this court for consideration and their solution, due to the development of oil, gas, and other mineral industries in this state, is of great importance to the bench and bar, as well as to all others who may be affected thereby. Because of this importance, the case has received wide publicity in the legal fraternity. In addition to the exhaustive briefs of counsel for plaintiffs and defendants, we were favored with several briefs amici curiae, presenting the different views entertained by the members of the bar of this state on the subject matter. Appreciating the importance of the issues herein involved, we did not confine our efforts to the briefs in answering the many questions raised, but devoted much time and effort in an independent research before reaching any conclusion. We also reviewed the treatises and works on the subject furnished us by the members of the faculty of the three law schools in this state, all of which have been of material assistance in clarifying these issues which were otherwise much confused in the minds of both the profession and the laity.

■ Our learned brother below was of the opinion, in which we concur, that plaintiffs' reservation in the deed of February 22, 1927, could not be classified as a rent charge, regulated by the provisions of Chapter 1 of Title 10 of the Revised Civil Code, under the articles beginning with Article 2779.

The Revised Civil Code provides that "The contract of rent of lands is a contract by which one of the parties conveys and cedes to the other a tract of land, or any other immovable property, and stipulates that the latter shall hold it as owner, but reserving to the former *an annual rent of a certain sum of money, or of a certain quantity of fruits,* which the other party binds himself to pay him" (Article 2779), and that "* * * although stipulated to be perpetual, is essentially redeemable * * *" (Article 2788) in accordance with the value of the property

as fixed by the contract (Article 2789). But "If there has been no valuation [fixed by the contract], the rent is considered as fixed at the rate of six per cent. on the value, and the lessee may pay the capital at that valuation." Article 2790. (Brackets and italics ours.)

It is our view that the codifiers of our basic law, in providing that in order to create a rent charge in conveying a tract of land there must be a reservation by the vendor of an annual rent of "* * * a certain quantity of fruits * * *," had in mind a definite and fixed quantity, such as a certain number of bushels, if the fruit be grain. To hold otherwise would render meaningless the other articles of the Code on the subject matter, and particularly Articles 2788, 2789, and 2790. We are fortified in this view because they (the codifiers) not only distinguished the contract for the rent of lands as defined in Article 2779 from a lease contract, but also pointed out the similarities between the two, stating that "The contract of rent partakes of the nature of sale and of lease. * * * Of lease, inasmuch as it subjects the rentee to the payment of rent." Article 2782. But in providing for one of the essential elements of a lease in the contract of rent, i. e., the price, which, in an ordinary lease contract, "* * should be certain and determinate * *," but "* * * may consist in a certain quantity of commodities, or even in a portion of the fruits yielded by the thing leased" (Article 2671) they omitted the latter clause. This clause was omitted for the obvious reason that a rent charge is essentially redeemable, and a royalty reservation of the character involved here, even if it could be classed as a fruit within the meaning and contemplation of the Code, a share "* * * or even * * * a portion of the fruits yielded by the thing leased," does not comprise a certain quantity, nor has it a fixed or determinate value whereby an accurate estimate can be made of its capital value for the redemption thereof.

The trial judge concluded that the reservation made by the plaintiffs in their deed to Wolke constituted a mineral right or servitude subject to the prescription of ten years liberandi causa, being of the opinion that the "* * * term 'royalty' can only be correctly used when it means the rental arising from a lease," and, commenting, he stated further that:

"When the term is used in any other contract affecting minerals, having for its purpose something other than a lease, then the incorrect use of the term can only be interpreted in the sense which would make effective the contract really intended in the light of the jurisprudence existing on the subject.

"It is obvious that where no reference was made to a lease in the reservation itself, and where no lease was on the property at the time the reservation was executed, then the reservation merely vested in the plaintiff's 1/16 part of the oil, gas, and other minerals.' "

In reaching this conclusion we think the trial judge failed to give consideration to the fundamental principle that legal

agreements have the effect of law upon those who form them and that "none but the parties can abrogate or modify them" (Article 1945, Revised Civil Code), as well as the corollary rules for the interpretation and construction of contracts as laid down in Section 5 of Chapter 3 of Title 4, article 1945 et seq., of the Revised Civil Code, under the heading "Of The Interpretation Of Agreements," and the provisions of Article 1764 of the Revised Civil Code under the title dealing with the general provisions of conventional obligations, which provide that "All things that are not forbidden by law, may legally become the subject of, or the motive for contracts * * *," and also in connection therewith "* * * the third branch of the first division of obligations of this chapter [4] * * * called *real obligations*." Article 2010. (Italics and brackets ours.)

The Revised Civil Code further provides "That courts are bound to give legal effect to all such contracts according to the true intent of all the parties * * *," and this "* * * intent is to be determined by the words of the contract, when these are clear and explicit and lead to no absurd consequences." Article 1945. "The words of a contract are to be understood, like those of a law, in the common and usual signification, without attending so much to grammatical rules, as to general and popular use." Article 1946. "When there is anything doubtful in agreements, we must endeavor to ascertain what was the common intention of the parties, rather than to adhere to the literal sense of the terms." Article 1950. And "When the intent of the parties is doubtful, the construction put upon it, by the manner in which it has been executed by both, or by one with the express or implied assent of the other, furnishes a rule for its interpretation." Article 1956. See, also, Boisseau v. Vallon & Jordano, 174 La. 492, 141 So. 38; Salles v. Stafford, Derbes & Roy, 173 La. 361, 137 So. 62; Pratt v. McCoy, 128 La. 570, 54 So. 1012; Losecco v. Gregory, 108 La. 648, 32 So. 985; Linehan Ry. Transfer Co. v. New Orleans & N. W. R. Co., 107 La. 645, 31 So. 1026; McKie v. New Orleans, J. & G. N. R. Co., 16 La.Ann. 79, and Workman v. Insurance Co., 2 La. 507, 22 Am.Dec. 141, as well as Union Tank Car Co. v. Louisiana Oil Ref. Corp., 184 La. 121, 165 So. 638; and 13 Corpus Juris 520, paragraph 481.

The term "royalty" is defined by Thornton, in his Law of Oil and Gas (4th ed.), to be "* * * a sum paid after the production of oil or minerals and after they had been reduced to possession, in a certain proportion to the production thereof" Volume 1, Section 253, and by Corpus Juris, in reference to oil and gas leases, to be "* * * a share of the product or profit reserved by the owner for permitting another to use the property * * * the compensation provided for the privilege of drilling for oil and gas, and consists of a share in the oil and gas produced under existing leases. * * *." 54 Corpus Juris 1107.

Mrs. Harriet Spiller Daggett in her work on "Mineral Rights in Louisiana," soon to be released by the Louisiana State Uni-

versity Press, gives us the following analysis of the word "royalty":

"The word royalty originated in England where it was used to designate the share in production reserved by the crown from those to whom the right to work mines and quarries was granted. Such is its proper use today in mineral contracts. It is the price paid for the privilege of exercising the right to explore. If that right is granted by a lease contract, it is the whole or part of the consideration for the lease. If that right is granted or reserved by a sale, it is the consideration in part or whole of the sale. *Royalty in itself cannot be used to designate the fundamental right which is being dealt with but only to indicate the percentage, the price, the rent, the consideration attached to or proceeding out of the right or that may proceed from it during its existence.* The royalty depends upon the continued existence of the right to which it is an appendage. It cannot have a life of its own any more than could interest exist apart from the note or debt to which it is attached. If a party to a contract sells royalty under an existent lease, he is selling a part or the whole of his rent due from the lease upon which his royalty depends. If he sells royalty under an existing servitude, he is selling a part of the proceeds to issue from the use of that servitude and the royalty sale is dependent upon the life and use of the servitude. If a landowner sells royalty he is selling the proceeds that may issue from his right to explore for minerals on his own land, which is an inherent part of his owner-ship of the land. *If a landowner sells his land and the right to explore inherent in the land and reserves royalty, he is reserving a share in the anticipated production to result if and when successful exploration ensues upon the land sold in full ownership.*"

\*　　\*　　\*　　\*　　\*　　\*

"*The legal nature of royalty must be grounded upon the contract in which it appears.* If it be used within the understanding of the parties to indicate a sale or reservation of the right to extract oil and gas, then it is a servitude by whatever name it may be called, and the established rules connected with this type of servitude will apply. If it is used in a lease contract to indicate a proportionate share of the production going to the landowner or the lessor of the servitude or to his lessee, the law of lease and sublease will be applied. If the word is used in the contract to indicate a passive interest in possible production, without the leasing or production privilege usually inherent in the right, then a new and as yet, uninterpreted situation appears, upon which the court has not declared itself fully." (Italics ours.)

It is immaterial what term is used in characterizing the interest reserved by the plaintiffs, because they have, by clear and unmistakable language, described the interest reserved by them to be a full share, free of the cost of production, of $\frac{1}{16}$th of the oil, gas, and other minerals, and a twenty-five cents per ton royalty on all salt and sulphur, if and when successful exploration is had upon the land sold by them to defendant F. N. Bullock.

"Perfect ownership gives the right to use * * * and to dispose of one's property in the most unlimited manner * * *" (Revised Civil Code, Article 491), and nothing will be found in either the letter or the spirit of our law to prevent an owner from dismembering his property and from disposing of each separate dismemberment as he pleases. Baudry-Lacantinerie, des Biens (3d ed.) 289, paragraph 356. See, also, Frost-Johnson Lumber Co. v. Salling's Heirs, 150 La. 756, 91 So. 207, and Queensborough Land Co. v. Cazeaux, 136 La. 724, 67 So. 641, L.R.A. 1916B, 1201, Ann.Cas.1916D, 1248.

In the case of Mt. Forest Fur Farms of America, Inc., v. Cockrell, 179 La. 795, 155 So. 228, 229, where the rights of the parties in a reservation of similar character were under consideration, this court made the following pertinent observation:

"* * * aside from the landowner's exploring his own land for minerals, he has only two possible sources of income or profit in dealing with his land: (1) The cash consideration or bonus which he may receive for the lease, and payments made for renewals of the lease; and (2) the royalty.

*"There is no reason why, in disposing of his land, the landowner may not reserve to himself both of these sources, nor is there any reason why he should not reserve but one of them, or a percentage of one or of both."*

When obligations are attached to immovable property, they "* * * are called real obligations * * *" (Revised Civil Code, Article 2010), and "Not only the obligation, but the right resulting from a contract relative to immovable property, passes with the property." Article 2011. Such obligations may be created in three ways, one being "By the alienation of immovable property, subject to a real condition, either expressed or implied by law" (Article 2012), and "* * * is susceptible of all the modifications that the will of the parties can suggest, except such as are forbidden by law." Article 2013.

We therefore conclude that the plaintiffs, by the reservation made in the transfer of their property by deed of February 22, 1927, imposed on the property a real obligation which passed with the property into the hands of the present owner.

■ We shall now pass to the consideration of the question as to whether the prescription of ten years, liberandi causa, is applicable to the case at bar and if so whether or not the same has been interrupted.

In the original opinion handed down by this court in the case of Frost-Johnson Lumber Company v. Salling's Heirs, 150 La. 756, 91 So. 207, 210, where the contention was urged by the plaintiffs that even if the right reserved by the defendants then under consideration should not be construed to be a servitude as defined by the articles of the Revised Civil Code, "* * * *it was a real right or obligation in their [defendants] favor imposed upon the land,* and that all real rights and obligations are extinguished by the prescription of 10 years, liberandi causa," (italics and

brackets ours) the court disposed of that issue by giving a concise analysis of the pertinent codal articles as follows:

"Article 3528 of the Code declares:

" 'The prescription which operates a release from debts, discharges the debtor by the mere silence of the creditor during the time fixed by law, from all actions, real or personal, which might be brought against him.'

"And article 3529 declares:

" 'This prescription has also the effect of releasing the owner of an estate from every species of real rights, to which the property may have been subject, if the person in possession of the right has not exercised it during the time required by law.'

"Article 3549 declares:

" 'In cases of prescription releasing debts, one may prescribe against a title created by himself; that is, against an obligation which he has contracted.'

"The words 'debt' and 'obligation,' as used in these articles of the Code, are synonymous terms. See article 3556, No. 20 and No. 21.

"Article 3544 (in the section treating of the prescription which operates a release from debt) declares:

" 'In general, all personal actions, except those before enumerated, are prescribed by ten years.'

"Then follows article 3546, repeating, in substance, article 789, viz.:

" 'The rights of usufruct, use and habitation and servitudes are lost by nonuse for ten years.'

"Therefore, if the right reserved by Mr. and Mrs. Salling was, not ownership of whatever oil and gas there was or might have been under plaintiff's land, but a servitude *or real obligation* imposed upon the land in favor of Mr. and Mrs. Salling and their heirs and assigns, the right has been 'lost by nonuse of ten years.' " (Italics ours.)

In the case of Smith v. Johnson, 35 La. Ann. 943, where the plaintiff urged that the plea of *prescription of 10 years* was applicable to the hypothecary action under Articles 3528 and 3529 of the Revised Civil Code, this court said: "The question whether the *prescription of ten years declared by Art. 3529, C.C.,* applies to the hypothecary action against the third possessor of property, has been the shuttlecock of our jurisprudence," and concluded that "* * * *the 'real rights,' referred to in Art. 3528,* do not *include* mortgages, but *only such real rights as are evidenced and preserved by their exercise."* See, also, Sample v. Whitaker, 171 La. 949, 132 So. 511, and Huie Hodge Lumber Co. v. Railroad Lands Co., 151 La. 197, 202, 91 So. 676.

The reservation in controversy here, as shown hereinabove, is a real obligation in favor of the plaintiffs, their heirs or assigns, and in our opinion is a species of real right subject to the prescription of ten years, liberandi causa, within the meaning and contemplation of the Revised Civil Code articles above referred to.

It is argued by some that as a royalty owner, unlike the owner of a mineral servitude, cannot go upon the land for the purpose of exploring for the minerals but must await such time as the landowner has developed it or caused the same to be done, and then if there be production to claim his royalty interest, the prescription is suspended and does not begin to run until some minerals are developed and produced, because until such time the reserver has no claim to enforce. Some are of the opinion that because the royalty owner does not have the right to explore the land for minerals, this court, in order to apply the prescription, would have to ignore the doctrine of "obstacle" of the Revised Civil Code. Others argue that when the landowner grants a real interest to a third party, because of the nature of such an obligation, there is an implied obligation growing out of the contractual relation of the parties that the grantor or his heirs or assigns will use the land with reference to the royalty as a prudent administrator and that as such it is incumbent upon the owner to lease the lands for mineral development when an opportunity to do so presents itself and can absolve himself from the application of the prescription liberandi causa only by showing that he had no opportunity to lease the premises for mineral development.

As stated above, unlike the owner of a servitude, there is no obligation on the part of the royalty owner to explore for and develop the minerals and it necessarily follows that the obstacles referred to in Article 792 of the Revised Civil Code are not applicable.

Under Article 2013 of the Revised Civil Code it is stated that a "* * * real obligation, created by condition annexed to the alienation of real property * * * are either conditions precedent, which suspend the operation of the contract until they are performed, or subsequent and resolutory, which, unless they are performed, annul the contract," and further that *"These* [obligations] *will be more fully defined in the section which treats of conditional obligations."* (Italics and brackets ours.)

We find that "Conditional obligations are such as are made to depend on an uncertain event. If the obligation is not to take effect until the event happen, it is a suspensive condition" (Article 2021), and "When an obligation has been contracted on condition that an event shall happen within a limited time, the condition is considered as broken, when the time has expired without the event having taken place. If there be no time fixed, the condition may always be performed, and it is not considered as broken, until it is become certain that the event will not happen." Article 2038.

In the instant case the obligation created in favor of plaintiffs, that is, to receive 1/16th of all of the oil, gas, or other minerals and 25¢ per ton on all salt and sulphur mined, was conditioned upon the production of oil, gas, or other minerals. True the contract did not designate a time within which the event must happen, nevertheless that time is limited by law and "the

condition is considered as broken, when the time [10 years] has expired without the event having taken place." (Brackets ours.)

■ This brings us to the final issue urged by plaintiffs, that the prescription has been interrupted by the acts, stipulations, and acknowledgments of the defendants.

The stipulations relied on by plaintiffs for the interruption of prescription in this case are to be found in (1) the deed by C. W. Wolke to F. N. Bullock, (2) the donation by F. N. Bullock to Laura Jacobs Bullock, and (3) the mineral lease executed by Laura Jacobs Bullock to W. W. Smith.

This plea is based on Article 3520 of the Revised Civil Code which states that "Prescription cases * * * to run whenever the debtor, or possessor, makes acknowledgment of the right of the person whose title they prescribed. * *. * " See, also, Article 3546 of the Revised Civil Code; Frost-Johnson Lumber Co. v. Nabors Oil & Gas Co., 149 La. 100, 88 So. 723; Sellington v. Producers' Oil Co., 152 La. 81, 92 So. 742; Lewis v. Bodcaw Lumber Co., 167 La. 1067, 120 So. 859; White v. Ouachita Natural Gas Co., 177 La. 1052, 150 So. 15, and Frost Lumber Industries, Inc., v. Union Power Co., Inc., 182 La. 439, 162 So. 37. However, this court in the case of Goldsmith v. McCoy, 190 La. 320, 182 So. 519, 522, quoted with approval from the case of Bremer v. North Central Texas Oil Co., Inc., et al., 185 La. 917, 171 So. 75, the following: "But article 3520 of the Code * * *

does not mean that a mere acknowledgment of the existence of the rights of those in whose favor the servitude runs interrupts prescription. *There must be more than a bare acknowledgment; the acknowledgment must be accompanied by or coupled with 'the purpose and intention of the party making the acknowledgment to interrupt the prescription then running.'*" For an exhaustive review of the jurisprudence on the subject matter see the case of Frost Lumber Industries, Inc., v. Union Power Co., Inc., supra.

■ The stipulations relied upon by plaintiff in the transfer from C. W. Wolke to F. N. Bullock simply state the fact that the reservation here involved is contained in the original act, while the one in the act of donation by Bullock to his wife states that the donation is made subject to the reservation made by plaintiff as evidenced by the deed from Wolke to him and are, therefore, mere acknowledgments that at the time of the execution of these acts the property was subject to a real obligation in favor of plaintiffs and are not acknowledgments within the meaning and contemplation of Article 3520 of the Revised Civil Code as interpreted by this court. The clause in the lease relied upon for the interruption of the prescription reads as follows:

"On certain of said tracts certain royalty interests have been reserved by prior owners and it is understood that this lease covers and applies to and *grants to Lessee a full ⅞ths lessee interest,* and the royalties reserved by prior owners shall be deducted.

from the royalty interest of Lessors as hereinafter set out, *so that the full ⅞ths working interests shall go to the Lessee just as if no such royalties were reserved in prior owners.*" (Italics ours.)

 This lease was reformed by a subsequent act dated March 25, 1936, which contains the following:

"On certain of said tracts certain royalty interests have been reserved by prior owners and *it is understood that this lease covers and applies to and grants to Lessee a full ⅞ths lessee interest,* and the royalties reserved by prior owners shall be deducted from the royalty interest of Lessors as hereinafter set out, so that *the full ⅞ths working interest shall go to the Lessee just as if no such royalties were reserved in prior owners.*

\* \* \* \* \* \*

"It appearing that there are *outstanding mineral rights* held by other parties not included among the original owners, to-wit:

\* \* \* \* \* \*

"*Now lessors declare that the intent was and is to convey to lessee the full seven-eighths (⅞ths) lessee interest* and that there shall be deducted from the one-eighth (⅛th) stipulated in favor of lessors, the royalties reserved to prior owners of that which is herein leased to W. W. Smith, whether now owned by vendors or their assigns, and likewise those royalty interests assigned by C. W. Wolke and/or F. N. Bullock to other parties.

"The parties hereto correct and reform the original lease in the manner and terms

herein set forth, the same otherwise as originally set forth." (Italics ours.)

A mere reading of the above stipulations conclusively shows that at the time of the execution of the lease there were outstanding on certain of said tracts, certain royalty interests, which, if and when oil was produced, were to be paid out of the ⅛th reserved by the lessors in their contract of lease. It is obvious that the purpose of the stipulations relied upon was to protect and insure the lessee of his full ⅞ths share of the lease. There is nothing in the language used in the lease or the supplement thereto to show or indicate that the owner in executing the same intended to interrupt prescription then accruing against the plaintiffs, or any other owners of real obligations outstanding at that time.

 Plaintiffs' next contention is that the fact that the lease above referred to dated February 19, 1936, is for a primary term of three years, coupled with the stipulations in the several acts above referred to, the term thereof extending beyond the prescriptive period of ten years, under the holding of this court in the case of Mulhern v. Hayne, 171 La. 1003, 132 So. 659, 660, the life of their right has been extended accordingly. In that case there was the joint execution of a lease by the owner of the land and the owners of the servitude thereon for a period extending beyond the time in which the servitude would have prescribed and the court held:

"*By joining in this lease plaintiff thereby recognized all of the rights of his coles-*

sors, and he cannot escape the effect of his written acknowledgment, which, in our opinion, we must hold to be an interruption of the then accruing prescription." (Italics ours.)

The theory upon which the foregoing decision is based is explained in the case of Bremer v. North Central Texas Oil Co., 185 La. 917, 171 So. 75, 77, in the following language:

"*Manifestly the life of the servitude had to be extended to make the five-year lease valid for that length of time.*" (Italics ours.)

In the instant case, it is conceded that, in order to give a valid lease, it was not necessary for the plaintiffs (royalty owners) to join in the execution thereof, and, consequently, the decision in the Mulhern case is not applicable.

 The next contention urged by plaintiffs is that the lessee produced oil on one of the several tracts covered by the lease and, inasmuch as production on one tract was, by the terms of the lease, deemed to be development of the entire property, there was an interruption of prescription then accruing against their rights, citing in support thereof the case of Patton v. Frost Lumber Industries, 176 La. 916, 147 So. 33. In that case the original owner of a large tract of land comprising some 30,000 acres reserved the minerals thereunder, and subsequently the property was conveyed to several individuals in 40-acre tracts. Patton, who acquired one of such small tracts subject to the servitude, contended that after the land had

been so divided, the mineral servitude as to each tract became separate and distinct from the servitude on the remaining portion of the land, and that the drilling on another portion of the original 30,000 acres did not interrupt prescription as against his forty acres. This court held that the servitude was preserved as an entirety by the drilling and production of gas on the property within ten years, citing with approval the case of Lee v. Giauque, 154 La. 491, 97 So. 669, 670, wherein it was held that "* * * the exercise upon any part of a continuous tract of land of a servitude extending over the whole tract preserved the servitude over the whole for the reason that there is but one servitude on the whole tract."

In the case at bar, the real obligation in favor of the plaintiffs rested exclusively on the property they deeded to Wolke on February 22, 1927, and on no other. Moreover, that property is not contiguous to the property developed nor was it carved out of a larger tract upon which a real obligation rested, out of which plaintiffs acquired their interest. We therefore conclude that plaintiffs' contention is not well founded.

 The final point urged to show an interruption of prescription is that the lessee attempted to pool or communize all royalty interests outstanding at that time by having the owners execute an instrument prepared for that purpose. The answer to that point is that the instrument could only be given legal effect if it had been confected and signed by all the parties. The facts show that it was plain-

tiffs' refusal to sign the document which prevented its confection.

For the reasons assigned, the judgment of the lower court is affirmed, plaintiffs to pay all costs.

O'NIELL, C. J., is of the opinion that the ten years' prescription was interrupted by the clauses in the contract of lease dated February 19, 1936,—especially as explained by the instrument dated March 25, 1936,—which clauses, virtually, ordered the lessee to pay to the holders of the so-called $\frac{1}{16}$ royalty interest, reserved in the deed dated February 22, 1937, one-half of the one-eighth royalty stipulated in the lease, and to pay only the remaining half of the one-eighth royalty to the lessors.

In other respects, the CHIEF JUSTICE concurs in the prevailing opinion in this case.