On Second Rehearing
HAWTHORNE, Justice.
Pursuant to R.S. 13:4811 et seq., Union Oil & Gas Corporation of Louisiana instituted this concursus proceeding to determine the disposition of the funds accruing to a disputed Yu royalty interest on oil and gas produced from a well completed by petitioner on or about January 11, 1955. The well was drilled under mineral leases owned by petitioner on lands in Jefferson Davis Parish, Louisiana, including the NE]4 of Section 33, Township 10 South, Range 4 West.[1] The claimants are Wallace J. Broussard on the one part and Harry E. Hawthorne, Hugh A. Hawthorne, Harry R. Hawthorne, and J. Woodrow Waggoner on the other part, hereafter designated as the Hawthorne group.[2]
The pertinent facts necessary for this opinion are these:
On January 19, 1943, Niblett Farms, Inc., the owner of a large tract of land together with all the minerals, conveyed a Yu royalty interest to various persons in varying proportions. On May 11, 1948, Niblett Farms sold the property to claimant Wallace J. Broussard by act which contains the following provisions:
“(a) There is excepted from this conveyance oil, gas and other mineral royalties and royalty rights heretofore reserved and sold to others and hereby especially reserved to the vendor in the total of %2nds of all of the oil, gas and *705 other minerals produced or to he produced and saved from the land; provided, however, that the foregoing %znds royalty interest includes as a part thereof a royalty interest of Vath of the oil and gas on and under said land and to be produced therefrom, being the same %4th interest heretofore sold to Mrs. Sarah L. Martin, David C. Ritchie, Mrs. Gladys C. [G.] Burchenal, Charles A. McCoy and Mrs. Gertie Holloway [Hallowell], by deed dated January 19, 1943, and recorded on page 29, Book 98 of the Records of the Parish of Jefferson Davis, State of Louisiana, the rights of Grantor under this additional reservation being subject to the prior sale so made, but including all reversionary rights of grant- or as the present owner of said land, it being the intention that if and when the Vsith. royalty rights so sold should terminate, the reversion thereof shall be for the benefit of grantor herein whose rights to such additional amount of royalties shall immediately become effective. [Italics ours.]
“(b) Vendor herein reserves for itself and its successors arid assigns a mineral right interest in the said land, together with all necessary rights of ingress and egress thereon, equal to one-half i}/¿) of the oil, gas and other minerals therein and thereunder, but subject to the limitations and conditions hereinafter stipulated.
“(c) Two-thirds {t/z) of the amount of outstanding royalties hereinabove excepted from this conveyance, or a total of %2nds of all of the oil, gas and other minerals produced from said land shall be chargeable against and payable out of the mineral right interest herein reserved to and by vendor; the remaining %2nd royalty interest being chargeable to and deducted from the rights of the vendee in the land herein described.
“(d) No lease shall be granted unless such lease provides for sufficient royalties payable out of the oil, gas and other minerals produced from the land to pay all royalties outstanding on the date of this deed and which are to be charged against the respective rights of the parties as set forth in paragraph (c) hereof, and so as to pay vendee herein, or his successors and assigns, a minimum royalty of %2nd of all the oil, gas and other minerals produced and saved from the property. Should any lease to be negotiated in the future provide for total royalties in excess of the usual i^th, then the amount of royalties in excess thereof shall then be divided between and belong to vendor and vendee, or their respective successors or assigns, in equal proportions.”
*707 It .is to be noted that under this conveyance Niblett Farms reserved Yz of the minerals, conveying to Broussard the other Yz together with all the lands.
In September, 1948, Niblett Farms sold to Harry E. Hawthorne the Yz of the minerals which it had reserved.[3]
In 1949 and 1950 Wallace J. Broussard and Harry E. Hawthorne executed oil and gas leases covering the property which provide for a royalty to be paid to the lessors of Ys °f the oil and gas produced from the premises. Union as the owner of these leases drilled a well in the NE Ya of Section 33, Township 10 South, Range 4 West, Jefferson Davis Parish, Louisiana, which was completed as a producer of oil and gas condensate in paying quantities on or about January 11, 1955.
Let us now return to the Vzi royalty interest sold by Niblett Farms on January 19, 1943, to the following persons in the following proportions:
Mrs. Sarah L. Martin ifo
David C. Ritchie 1/144
Mrs. Gladys G. Burchenal 1/144
Charles A. McCoy 9*720
Mrs. Gertie Hallowell tyfeo
It is conceded by all claimants that 10 years elapsed without production after the creation of the Vzi royalty interest. At the end of this period, that is, on January 19, 1953, the land was owned by Wallace J. Broussard, and the minerals were owned as follows:
Wallace J. Broussard %
Harry E. Hawthorne %2
Hugh A. Hawthorne %2
Harry R. Hawthorne %2
The three Hawthornes as successors to Niblett Farms owned the Yz mineral interest reserved by Niblett in its sale to Broussard. In other words, on January 19, 1953, Broussard was the owner of the land and Yz of the minerals, and the three Hawthornes, in the proportions shown above, were the owners of the other Yz of the minerals.
On January 16, 1953, Harry E. Hawthorne, at that time the owner of %2 of the minerals, executed an instrument declaring that he reactivated those portions of the Vzi royalty sold to David C. Ritchie and Mrs. Gladys G. Burchenal (an undivided Via each). Subsequently Ritchie and Mrs. Burchenal conveyed this V12 royalty interest to J. Woodrow Waggoner, and Waggoner on May 8, 1953, conveyed one-half of it, or Via royalty, to Hugh A. Hawthorne. In other words, this Y12 royalty is now claimed by Hugh A. Hawthorne and J. Woodrow Waggoner in the proportion o'f Via to each.
The trial judge found that under the instrument of May 11, 1948, Broussard was entitled to % of the outstanding Vza royalty and the Hawthorne group to z/z. He recog *709 nized also that under the instrument of January 16, 1953, the share of Harry E. Hawthorne was chargeable with the royalty interest which Hawthorne had recognized or reactivated. As a result he concluded that the royalty was owned as follows:
Wallace J. Broussard Vh royalty
Harry E. Hawthorne %76 royalty
Hugh A. Hawthorne %76 royalty
Harry R. Hawthorne V288 royalty
J. Woodrow Waggoner Va4 royalty
Accordingly the judge ordered the sum deposited by Union to be paid in the following proportions:
To Broussard *948, or %.of the-whole;
To the Hawthorne group % of the whole, as follows:
Harry E. Hawthorne %8
Hugh A. Hawthorne ‘ i%8
Harry R. Hawthorne
J. Woodrow Waggoner %8-[4]
All claimants with the exception of Wag-goner perfected suspensive appeals to this court.
Broadly speaking, the primary contentions of these claimants are as follows: Broussard contends that when the %4 royalty prescribed or terminated, he as owner of the land became entitled to the of production of oil and gas. The other claimants, the Hawthorne group, take the position that the royalty interest was a charge on the Y2 mineral interest reserved by Niblett Farms, and that consequently when it prescribed or ceased to exist, they as successors of Niblett are entitled to the ' of prodúction of oil and gas: Thus Broussard claims the entire fund deposited in the court, and so does the Hawthorne group.
As stated in the leading case of Vincent v. Bullock, 192 La. 1, 187 So. 35, a mineral royalty interest is not a servitude, but is a species of real right which entitles the owner to participate in production when and if production-is obtained, and is subject to the prescription of 10 years liberandi causa. Such a right is a conditional obligation depending on an uncertain event and prescribes in 10 years in the event production of the minerals does not occur within that period of time. See St. Martin Land Co. v. Pinckney, 212 La. 605, 33 So.2d 169.
It has been recognized and stated by this court that a royalty right is but an appendage of a mineral right, and that a mineral right due to its nature is necessarily superior to a royalty right. In Continental Oil Co. v. Landry, 215 La. 518, 41 So.2d 73, 75, we said:
“ * * * Of these two rights it has been correctly said by one of the authorities on the oil and gas law of this state that the royalty right is but an appendage of the- right of the mineral owner, and depends upon the continued existence- of the right to which it is an appendage. It cannot have a *711 life of its own, any more than could interest exist apart from the note or debt to which it is attached. See Daggett, Mineral Rights in Louisiana (1939), p. 173.” See also Vincent v. Bullock, supra.
In Arkansas Fuel Oil Co. v. Sanders, 224 La. 448, 69 So.2d 745, 746, this court stated:
“When the royalty right prescribed it passed out of the picture. There was nothing to revert to anyone. The parties are in the same position as though no royalty right had ever existed. It was merely a conditional obligation depending on an uncertain event which prescribed in ten years because the event did not occur. Vincent v. Bullock, 192 La. 1, 187 So. 35; St. Martin Land Co. v. Pinckney, 212 La. 605, 33 So.2d 169; Continental Oil Co. v. Landry, 215 La. 518, 41 So.2d 73; Union Sulphur Co. v. Lognion, 212 La. 632, 33 So.2d 178; Humble Oil & Refining Co. v. Guillory, 212 La. 646, 33 So.2d 182; Union Sulphur Co., Inc. v. Andrau, 217 La. 662, 47 So. 2d 38.”
At this point we might state that in this case we refuse to give any force and effect to that provision found in Paragraph (a) of the instrument of May 11, 1948, in which Niblett sold the property' to Broussard, stipulating that when the Yzi royalty previously sold should terminate, its reversion was for the benefit of the grantor. In other words, in this instrument the vendor was reserving to itself a reversionary right of a royalty previously sold so that when the royalty right prescribed, it would inure to the benefit of the grantor. We think that to recognize and give effect to such a reservation would be contrary to the public policy of this state. In Hicks v. Clark, 225 La. 133, 72 So.2d 322, we refused to recognize and give effect to the reservation of a reversionary interest of a mineral right. A royalty right is but an appendage to a mineral right and cannot have a life of its own, and a mineral right is by its nature superior to a royalty right. If the reservation of a reversionary interest in the superior right is contrary to the public policy of this state, it follows that the reservation of the reversion of the inferior right is likewise contrary to public policy. Moreover, under the jurisprudence of this court, when a royalty prescribes, it ceases to exist, and there is nothing to revert. Arkansas Fuel Oil Co. v. Sanders, supra.
At the time the Y¿i royalty sale was made, the vendor Niblett owned all the minerals, and accordingly this royalty right was an appendage of all the minerals and was a charge on all the minerals for the payment of the proceeds of the royalty in the event of production of oil and gas *713 before prescription accrued; it was not a charge on a fractional or pro-rata part of the minerals.
At the time this 3k royalty prescribed, the minerals were owned as follows:
Broussard %
Harry E. Hawthorne %2 Hugh A. Hawthorne %2
Harry R. Hawthorne %2
After 10 years with no production, prescription accrued, and this royalty ceased to exist, or, as said in Arkansas Fuel Oil Co. v. Sanders, supra, “it passed out of the picture. There was nothing to revert”. Consequently all the minerals to which this royalty was an appendage were relieved of its charge, and therefore, due to the ownership of the minerals at that time, Broussard’s 34 of the minerals was relieved of 34 of this charge to the extent of 34s, or X%6S, royalty, and the other 34 of the minerals, which belonged to the three Hawthornes, was likewise relieved of 34 of this charge. Hence when the 3k royalty prescribed or ceased to exist, the various mineral interests were relieved of its charge as follows:
Mineral Interest Royalty
% Broussard %8 or i%es
%2 Harry E. Hawthorne '}ÍG8
%2 Hugh A. Hawthorne %gs
%2 Harry R. Hawthorne %es
3%2 3%68 or 1/21
Now let us again consider the contract of May 11, 1948, by which Niblett Farms conveyed the property to Broussard and which contains the provisions designated (a), (b), (c), and (d), quoted above.
We recognize the principle of law that the plain intention of the parties to a contract not contrary to public policy or prohibitory law is to be given full force and effect. When Niblett sold the property to Broussard, it was perfectly legal for the vendor to provide that the 3k royalty was a part of, and included in, the %2 royalty reserved by it, and this shows that it was the plain intention as between Niblett and Broussard that in the event production was had before the accrual of prescription, the 3k royalty was to be deducted from Niblett’s %2 royalty, or that the proceeds inuring to this 3k royalty would be paid to the royalty owners and that Niblett would receive a %2 royalty less the 344, or a net %a royalty.
The provision of the contract as to how the 3k royalty was to be charged was in no way binding upon the owners of the 344 royalty as they were not parties to this contract. For the payment of this royalty in the event of production prior to the accrual of prescription these royalty owners had the right to have their royalty interest satisfied from all the minerals and not from a fractional part, for their royalty interest was a charge on all the minerals.
It is equally clear under this contract that if production was obtained prior to the accrual of prescription as to the 3k royal *715 ty, Broussard under leases providing for a total royalty of % to lessors was to receive a royalty interest of Yaz and no more. Thus under the plain provisions of the contract, in the event production had been obtained within 10 years,.the % royalty .including the Vk would have been payable as follows:
Royalty
Niblett %2 minus i/k = %e net royalty
Broussard %2 or %o net royalty
i/2i royalty owners or ¥:>c, net royalty r%6 or %
The next question, then, is how the Vs royalty provided for in the leases is to be divided between the parties to this contract in the event no production was had within 10 years and the Yz4 royalty sold by Niblett prescribed.
The instrument of May 11, 1948, provides that Niblett reserved unto itself a %2 royalty, but the very language of the instrument clearly shows that the disputed Y24 royalty is included in the %2 royalty reserved to. Niblett. The instrument says:
“ * * * the foregoing %2nds royalty interest includes as a part thereof a royalty'interest of %4th of the oil and gas on and under said land and to be produced therefrom, being the same Y24Ü1 interest heretofore sold to Mrs. Sarah L. Martin, David C. Ritchie, Mrs. Gladys C. [G.] Burchenal, Charles A. McCoy and Mrs. Gertie Holloway [Halloweíl] * *
In the event of production'prior to the’ accrual of prescription Niblett could recover only a %2 royalty minus a Yzi royalty, or a .net %e royalty, as stated above. For Niblett to receive a full %z royalty after prescription accrued would require a recognition of a reversionary right in Niblett to the disputed Y24 royalty which was included in the %2 royalty reservation. This would be contrary to the public policy of this state and also contrary to the law as established by the jurisprudence of this court that wheri prescription accrues, the royalty passes out of existence. Consequently this provision as well as any other provision of the contract reserving unto Niblett a full %2 royalty is ineffective, and Niblett under the contract is entitled, after the accrual of prescription as to the Y24 royalty, to recover a net %e royalty and no more. Stated somewhat differently, for Niblett to receive a full %2 royalty would require us to hold that when the Y24 royalty prescribed due to non-production, it reverted to Niblett or Niblett’s successors by provisions of the contract. This we will not do.
From a lease providing for a Ya royalty to lessors, Broussard under the contract was to receive a Yaz royalty and no more. At the time prescription accrued as to the Yza royalty he was the owner of Yz of the minerals. Consequently when the Y24 royalty prescribed or ceased to exist, his mineral interest was relieved of Yz of the burden or charge of this Y24 royalty, and hence from *717 the leases which provided for a Ys royalty he is entitled to a %s (¥32 plus J4s) royalty. From such a lease, under the provisions of the contract Niblett can receive, as already pointed out, only a net %e royalty. When the ¥¿i royalty prescribed or ceased to exist, the Yi. mineral interest of Niblett or its successors was relieved of Y¿ of the burden or charge of this ¥zi royalty, and consequently from the leases which provided for a Y& royalty they are entitled to a %s (%6 plus %s) royalty. For clarity, when prescription accrued as to the royalty, the Y royalty provided for in the leases became payable to Niblett (or its successors) and Broussard, each owning Y¿. of the minerals, as follows :
Niblett (or its Vis royalty plus %c royalty successors) under contract = %g
Broussard %s royalty plus %2 royalty under contract = %G or %
Let us now consider the instrument executed on January 16, 1953, by Harry E. Hawthorne, who at the time was the owner of %2 of the minerals and who declared in the instrument that he reactivated %44, or ¥12, of the royalty, which is now claimed Y2 each by J. Woodrow Waggoner and Hugh A. Hawthorne. The trial judge correctly analyzed the effect of this so-called reactivation and concluded:
“We must next consider the effect of the attempt by Harry E. Hawthorne to interrupt prescription as to the one/ seventy-second (¥r2) royalty owned by Mr. Ritchie and Mrs. Burchenal. Harry E. Hawthorne himself contends that his instrument of January 16, 1953 (U-24) extended the royalty to Mr. Ritchie and Mrs. Burchenal. Since he was as of that date, the record holder of a nine/thirty-second (%a) mineral interest he had a sufficient mineral interest to permit his interruption of that royalty. Since he is the only party giving up something of value and since he himself contends that the interruption was valid, the court recognizes that said one/seventy-second (¥12) was interrupted and will recognize the acts transferring title to Hugh A. Hawthorne to the extent of a one/one-forty-fourth (JÍ44) and J. Woodrow Wag-goner to the extent of a one/one-forty-fourth (JÍ44). Of course, this one/ seventy-second (¥12) which Harry E. Hawthorne interrupted must be charged to his mineral interest.”
Finally let us discuss Broussard’s contention that because of his ownership of the land he is entitled to the entire proceeds inuring to the ¥a royalty deposited in the registry of the court.
As we have pointed out, it is well settled under the jurisprudence of this court that a royalty right is an appendage to a mineral right and cannot have any life of its own, and that when a royalty right prescribes, it ceases to exist, and the parties are in the same position as though no royalty *719 right had ever existed. Under these principles of law how can it be argued that when a royalty right prescribes or ceases to exist, it inures to the benefit of the owner of the land simply because of such ownership even though the landowner may own no mineral interest whatever?
For example, A, the owner of the land and the minerals, sells all the minerals to B. One year later B, the owner of all the minerals, sells a Vie royalty to C. After the mineral servitude created by A’s sale to B of all the minerals has been in existence some eight years, a bona fide drilling operation is conducted which results in a dry hole. Of course this drilling operation would interrupt prescription as to the mineral servitude, which would continue in existence for another 10 years. However, upon the expiration of 10 years from the royalty sale without production, even though the mineral servitude was still in existence, could it be said that the Vio royalty came back to the land and inured to the benefit of the landowner even though the landowner owned no minerals? If this were true, all the minerals would be owned by B, and A, the landowner, would own a Yi6 royalty. Flow could this be if a royalty right is but an appendage of a mineral right, depends upon the continued existence of the right to which it is an appendage, and ceases to exist when prescription accrues? If it ceases to exist, it does not inure to the benefit of anyone; all that happens is that the mineral interest to which it is an appendage is relieved of its charge.
Let us illustrate by another example. A, owner of the land and the minerals, sells a Yiq royalty to B. Five years later A sells all the minerals to C. There is no production. Five years after the mineral sale the Yie royalty prescribes and ceases to exist. However, after the royalty prescribes but before the mineral servitude prescribes, production is had. Although C owns all the minerals at the time this production is obtained, would A, solely because of his ownership of the land, be entitled to a Yie royalty from the production? If the royalty has ceased to exist and the parties are in the same position as though no royalty has ever existed, can there be any conclusion other than that C, the owner of all the minerals, would receive all the royalty from production ?
Therefore, under the jurisprudence it is patent that Broussard is not entitled to the entire proceeds of the Yva royalty by virtue of his ownership of the land.
For the reasons given above, we have concluded that the fund on deposit in the registry of the court should be divided in the following proportions:
}/i to Broussard
)/i to the Hawthorne group (including Waggoner).
Of the Y& royalty due to lessors under the leases, a %6 royalty should go to Broussard *721 and a %6 royalty to the Hawthorne group (including Waggoner) as successors to Niblett.
There is no dispute as to the interest of the Hawthorne group among themselves; the only dispute is between Broussard on the one part and the Hawthorne group on the other. We think it to the best interest of all parties that we remand this case to the district court so that a proper decree can be rendered ordering a distribution of the funds in the registry of the court pursuant to the views expressed above' and setting forth the proportionate share of each claimant. This decree must also take into consideration the fact that Harry E. Hawthorne’s interest is to be charged with a %2 royalty, of which is to be credited to Hugh A. Hawthorne and to J. Woodrow Waggoner.
For the reasons assigned the judgment of the district court is reversed and set aside, and for the purpose given above the case is remanded to the district court for a distribution of the fund in the registry of the court in accordance with the views here expressed.
It is further ordered that the decree of the lower court relieve the Union Oil & Gas Company of Louisiana of all liability for the payment of the money deposited in this concursus and for all costs of these proceedings.
All costs are to be paid in accordance with R.S. 13:4816.
The right to apply for a rehearing is reserved to all appellants.
SIMON, J., adheres to original opinion on First Rehearing.
HAMITER, J., concurs adhering to his previously assigned reasons.

. Petitioner deposited in the registry of the court $5,532.51 as the value of the royalty interest in dispute from date of first production to April 20, 1955.

. The writer of this opinion is not acquainted with any member of the Hawthorne group, nor is he to his knowledge related to them.

. In 1952 Hawthorne, Ine., the name to which the corporation Niblett Farms, Inc., was changed, conveyed to Harry E. Hawthorne “All of the right, title and interest which Hawthorne Inc. owns to the reversionary mineral and/or royalty rights” in and to, among other lands, the land upon -which the producing well was drilled.

. See trial judge’s reasons for judgment, quoted in both our original opinion and our opinion ón first hearing.