On Rehearing
SIMON, Justice.
The Union Oil & Gas Corporation of Louisiana as the assignee of two mineral leases insofar as they affect the North Half (Ny&) of Section 23, Township 10 South, Range 4 West of lands in Jefferson Davis Parish, impleaded the conflicting claimants as to the ownership of a %4th royalty interest in the oil and gas produced by it under said leases. It deposited $5,531.15, realized from the sale of the oil and gas produced, in the registry of the court, representing the value of the %tth royalty interest here in dispute among the named defendants from the date of first production, January 11, 1955, until April 20, 1955.
In January, 1943 Niblett Farms, Inc., the then owner of the land upon which production was later obtained, sold a %áth mineral royalty interest to five named parties, including David C. Ritchie and Mrs. Gladys R. Burchenal. On May 11, 1948, Niblett Farms, Inc., sold the land to Wallace J. Broussard, subject to the following provisions among others:
“(a) There is excepted from this conveyance oil, gas and other mineral royalities and royalty rights heretofore reserved and sold to others and hereby especially reserved to the vendor in the total of %2nds of all of the oil, gas and other minerals produced or to be produced and saved from the land; provided, however that the foregoing %2nds royalty interest includes as a part thereof a royalty interest of j&tth of the oil and gas on and under said land and to be produced therefrom, being the •same %rth interest heretofore sold to Mrs. Sarah L. Martin, David C. Ritchie, Mrs. Gladys C. Burchenal, Charles A. McCoy and Mrs. Gertie Halloway, by deed dated January 19, 1943, and recorded * * * the rights of Grantor under this additional reser *677 vation being subject to the prior sale so made, but including all reversionaryrights of Grantor as the present owner of said land, it being the intention that if and when the th royalty rights so sold should terminate, the reversion thereof 'shall be for the benefit of Grantor herein whose rights to such additional amount of royalties shall immediately become effective.
“(b) Vendor herein reserves for itself and its successors and assigns a mineral right interest in the said land, together with all necessary rights of ingress and egress thereon, equal to one-half {}/£) of the oil, gas and other minerals therein and thereunder, but subject to the limitations and conditions hereinafter stipulated.
“(c) Two-thirds (%) of the amount of outstanding royalties hereinabove excepted from this conveyance, or a total of %2nds of all of the oil, gas and other minerals produced from said land shall be chargeable against and payable out of the mineral right interest herein reserved to any by vendor; the remaining %2nd royalty interest being chargeable to and deducted from the rights of the vendee in the land herein described.
“(d) No lease shall be granted unless such lease provides for sufficient royalties payable out of the oil, gas and other minerals produced from the land to pay all royalties outstanding on the date of this deed and which are to be charged against the respective rights of the parties as set forth in paragraph (c) hereof, and so as to pay vendee herein, or his successors and assigns, a minimum royalty of %2nd of all the oil, gas and other minerals produced and saved from the property. Should any lease to be negotiated in the future provide for total royalties in excess of the usual Ysth, then the amount of royalties in excess thereof shall then be divided between and belong to vendor and vendee, or their respective successors or assigns, in equal proportions.”
On September 22, 1948, Niblett Farms, Inc., sold to Harry E. Hawthorne all of the oil, gas, and other minerals and mineral rights affecting the land. Hawthorne, Inc., successor of Niblett Farms, Inc., then sold to Harry E. Hawthorne all of the reversionary rights averred to be owned by it. Between the date of that sale and December 8, 1952, Harry E. Hawthorne, Harry R. Hawthorne, and Hugh A. Hawthorne sold, resold, and donated, among themselves, royalty interests and 'mineral rights affecting their averred interests.
By act dated December 8, 1952 (superseded by an act of January 16, 1953), Harry E. Hawthorne and Hawthorne, Inc., attempted to reactivate those portions of the *679 %tth royalty interest sold to David C. Ritchie and Mrs. Gladys R. Burchenal. Each of the parties owned a Viath interest, the sum total being a Jfend interest. Mr. Ritchie and Mrs. Burchenal conveyed their interests to J. Woodrow Waggoner, who in turn conveyed Y of his interest to Hugh A. Hawthorne. Only the Jfend interest was averred to be alive at the time of trial.
There was no production from the land affected by the %rth mineral royalty interest within the ten-year period commencing January 19, 1943, the date of the royalty interest conveyance. On January 11, 1955, a producing well was completed on the land, thus provoking this proceeding to have the ownership of the production attributable to the Yith mineral royalty interest determined.
As hereinabove stated, a producing well was completed on this property in January, 1955. Wallace J. Broussard maintained that the Jkth royalty interest conveyed on January 19, 1943 prescribed on January 19, 1953, and that as owner of the land he became entitled to this %tth of production of oil and gas. He contended that there could be no reversionary royalty rights as set out in the act of sale to him. The Hawthorne interests and J. Woodrow Waggoner claimed that this %4th royalty interest was vested in them.
In the final opinion, after rehearing, the trial court held that there could be no enforceable reversionary interests as declared upon in paragraph (a) of the contract of sale, supra, but that the %i4th mineral royalty interest, owned by Ritchie and Burchenal, but thereafter acquired by Waggoner and Hugh A. Hawthorne in equal shares, was interrupted by the act of reactivation of December 8, 1952 (superseded by an act of January 16, 1953), supra. In his reasons for judgment the trial judge concluded:
“Premises considered we find that except as to the one/seventy-second (J72) which Harry E. Hawthorne interrupted and which is charged against his mineral interest, the one-twenty-fourth (Jik) royalty which is the subject of this dispute passed out of the picture. When the royalty passed out of the picture, since one/third (1/3) of the one/ twenty-fourth (%i) royalty was apportioned as having been taken from Mr. Broussard’s one/half (Y) minerals, Mr. Broussard is now entitled to one/third (1/3) of the outstanding one/twenty-fourth (%t) which amounts to a royalty of one/seventy-second (Vn). Harry E. Hawthorne is entitled to nine/sixteenths (%s) of two-thirds (%) of the one/twenty-fourth (%t) royalty less the one/seventy-second 0/72) which he interrupted; i. e., a royalty of one/five-seventy-sixths (%?e). Plugh A. Hawthorne is entitled to five/ sixteenths (%e) of two/thirds (%) of one/twenty-fourth (%t) plus the one/ *681 one-forty-fourth (Via) which he purchased from Mr. Waggoner; i. e., a royalty of nine/five-seventy-sixths (%7g). Harry R. Hawthorne is entitled to two/sixteenths (%s) of two-thirds ([2]/¡) of the one/twenty-fourth (Yzi); i. e. a royalty of one/two eighty-eights (%88). J. Woodrow Waggoner is entitled to a one/on e-forty-fourth
From this judgment all parties appealed, except Union Oil and Gas Corporation of Louisiana and J. Woodrow Waggoner.
It was contended by Hawthorne, Inc., Harry E. Hawthorne, Harry R. Hawthorne and Hugh A. Hawthorne, joined in brief by J- Woodrow Waggoner, that the trial judge was in error in adjudging an undivided one-third (%) interest in the Yii th mineral royalty to Wallace J. Broussard. They urged that even if the provisions of the contract of sale as to reversionary rights, paragraph (a), must be disregarded, said contract sufficiently sets forth that the %tth mineral royalty interest, under our law, must inure to their benefit.
On the other hand, Wallace J. Broussard maintained that, as owner of the land, he is entitled to the entire bkth mineral royalty interest.
The primary question to be resolved, and which for purposes of clarity may be restated, is whether the termination of the bkth royalty interest, extinguished as a result of the failure of production within the prescriptive period of ten years, sold by Niblett Farms, Inc. on January 19, 1943, and imposed by it as real obligation attached to the Yi mineral interest reserved by it in the sale of the land to Wallace J. Broussard on May 11, 1948, resulted in a benefit to the owners of the reserved mineral interest or to the fee owner of the land.
Throughout our jurisprudence, in adjudicating upon basic mineral rights, in resolving problems arising from the oil industry, then unknown to framers of our Civil Code, we have consistently and wisely followed and applied such of our codal articles as were most judiciously applicable to the nature of the rights asserted. We are justified in our pursuit of that course for the Legislature, during many years has, with rare exceptions, abstained from adopting statutes to guide us in determining the many involved controversies so frequently arising in this industry. The policy of applying the articles of our Civil Code, wherever applicable in resolving questions involving mineral rights, has been repeatedly adhered to by us.
One of the fundamental principles recognized in all jurisdictions is that of the freedom of contract. Our Civil Code pronounces that “perfect ownership gives the right to use, to enjoy and to dispose of one’s property in the most unlimited manner * * * LSA-C.C. art. 491. In the sense of the words “unlimited manner”, neither *683 the letter nor spirit of the law forbids an owner from making a variety of dispositions as affecting his ownership. Hence, one may dismember the ownership of his property and dispose of each separate dismemberment as he pleases, from which flows the basic principle that all things not forbidden by law* may legally become the subject of contracts and that the intention of the parties should be controlling. LSA-C.C. arts. 1764, 1945, 1953.
The declaration of codal Article 491, supra, is necessarily qualified thusly: “ * * provided it is not used in any way prohibited by law or ordinances.” There exists fundamental principles further qualifying this article, supra, in that whatever be the disposition it must contain nothing contrary to public order, public policy or good morals.
In Queensborough Land Co. v. Cazeaux, 136 La. 724, 67 So. 641, 644, L.R.A.1916B, 1201, we said:
“The declaration of article 491 that the owner may dispose of his property ‘in the most unlimited manner’ is qualified by the addition, ‘provided it is not used in any way prohibited by laws or ordinances’; and, as a matter of course, it is further qualified by the fundemental principles that the disposition must have in it nothing contrary to public order or public policy or good morals. But, in the absence of any objection of that kind, nothing will be found in the letter or in the spirit of our law to prevent an owner from making what disposition he pleases of his property.”
We further approved this principle in the case of Mt. Forest Fur Farms of America, Inc., v. Cockrell, 79 La. 795, 155 So. 228, 229, observing:
“ * * * aside from the landowner’s exploring his own land for minerals he has only two possible sources of income or profit in dealing with his land: (1) The cash consideration or bonus which he may receive for the lease, and payments made for renewals of the lease; and (2) the royalty.
“There is no reason why, in disposing of his land, the landowner may not reserve to himself both of these sources, nor is there any reason why he should not reserve but one of them, or a percentage of one or of both.”
We must also take full cognizance that obligations which are attached to immovable property are called real obligations. LSA-C.C. art. 2010. One of the methods in which these real obligations may be created is by the alienation of immovable property, subject to a condition, either expressed or implied by law. LSA-C.C. art. 2012. In their creation they are “susceptible of all the ■modifications that the will of the parties can suggest, except such as are forbidden by law.” LSA-C.C. art. 2013.
*685 In the landmark case of Vincent v. Bullock, 192 La. 1, 187 So. 35, 40, wherein, for the first time, we defined the nature of a mineral royalty interest, a decision which has guided us and those dealing in mineral royalties and which has established a rule of property, we said:
“ ‘Perfect ownership gives the right to use * * * and to dispose of one’s property in the most unlimited manner * * * ’ (Revised Civil Code, Art. 491), and nothing will be found in either the letter or the spirit of our law to prevent an owner from dismembering his property and from disposing of each separate dismemberment as he pleases.”
Manifestly, the sale of the Jááth royalty interest by Niblett Farms, Inc., to the five named purchasers, supra, on January 19, 1943, created in favor of the vendees, not a servitude, but a species of real right, a real and conditional obligation depending on an uncertain event, subject to the prescription of ten years liberandi causa, if the event, the production-of minerals, did not occur within that period of time. The mineral royalty, thus conveyed, 'as distinguished from a mineral servitude, was only a right, a real obligation, attached to the ownership of the land, and formed no part of the thing itself. St. Martin Land Co v. Pinckney, 212 La. 605, 33 So.2d 169; Humble Oil & Refining Company v. Guillory, 212 La. 646, 33 So.2d 182; LSA-C.C. Art. 2010.
It is to be observed that after the sale of this royalty interest, Niblett Farms, Inc., continued to own the land and all of the minerals, subject only to the obligation to account to the royalty purchaser for a I4tth of all minerals produced from the land if production occurred within the period of ten years from the date of the royalty sale. It is equally true, that, as the owner of the land and all the minerals, it had the perfect right to dismember its ownership and dispose of each separate dismemberment as it pleased, but just so long as it did not prejudice the acquired rights of its royalty vendees, or that it make any disposition contrary to law, public policy or good morals. The right of freedom of contract was duly exercised by it on May 11, 1948, when it sold the land to Wallace J. Broussard, and therein reserved to itself a mineral interest, a %2nds royalty interest and included a stipulation which provided in what proportions the real obligation created by the reservation of the royalty interest should be charged against the mineral rights reserved by Niblett Farms, Inc., and that of the mineral rights acquired by Broussard with his purchase of the land.
It must be conceded that immediately prior to the sale to Broussard, the entire mineral interest as well as the land was *687 owned by Niblett Farms. Inc., and the entirety of this mineral interest was charged with a real obligation flowing in favor of the owners of the %tth royalty interest, and to account to such royalty owners for %tth of any minerals that might be produced from the land within the 10-year prescriptive period. In selling the land to Broussard, the minerals were thus dismembered, reserving y% for itself and conveying the other y¿ with all of the land to Broussard. It follows that a mineral servitude was thus created in favor of Niblett Farms, Inc., under which it had the privilege of going upon the property for the purpose of exploring for the minerals and reducing them to possession if successful, but subject to the obligation to account to Broussard, the landowner for his y¡. share of the production. Suffice it to say the landowner enjoyed the same privilege subject to the same obligation to the other y¿ mineral owner. Clark v. Tensas Delta Land Co., 172 La. 913, 136 So. 1. It is equally true that whoever produced the minerals was also under the obligation to account to the owners of the royalty interest for their pro-rata share of the production, if production occurred within the ten-year prescriptive period. Vincent v. Bullock, supra; Union Sulphur Co. v. Lognion, 212 La. 632, 33 So.2d 178; Humble Oil and Refining Co. v. Guillory, supra; Union Sulphur Co. v. Andrau, 217 La. 662, 47 So.2d 38.
Niblett Farms, Inc. and Broussard could have agreed that the reserved royalty interest would be a charge solely against the mineral interest acquired by Broussard with his acquisition of the land, or they could have agreed that the reserved royalty interest would be a charge solely against the mineral servitude retained by Niblett Farms, Inc. Instead of agreeing on either of these alternatives, they agreed that ^rds of the reserved royalty interest, or a %2nds royalty interest, would be a charge against Niblett’s mineral servitude and that 1/3rd of the reserved royalty interest, or a %2nd royalty interest, would be a charge against Broussard’s mineral rights and that the !4tth royalty interest previously sold should be included in the royalty interest chargeable against Niblett’s mineral servitude. This agreement is embodied in paragraphs (a), (b) and (c) of the conveyance of May 11, 1948, by Niblett Farms, Inc., to Wallace J. Broussard set forth hereinabove.
It is well recognized that the mineral servitude reserved to Niblett Farms, Inc., in its sale of the land to Broussard is classified as incorporeal immovable property and it has been referred to as “the most valuable property in the state.” DeMoss v. Sample, 143 La. 243, 78 So. 482, 484; Ford v. Williams, 189 La. 229, 179 So. 298. And it is equally well settled that a real obligation may be created, such as the mineral servitude reserved, by imposing conditions on the alienation of real prop *689 erty, and when so created “is susceptible of all the modifications that the will of the parties can suggest, except such as are forbidden by law.” LSA-C.C. Arts. 2012,■ 2013, 1764, 2010.
Hence, it follows that when Niblett Farms, Inc., stipulated in the sale of the land to Broussard that %2nds of the royalty would be charged against the one-half mineral rights reserved by it in the sale and that the j4ith royalty interest previously sold was to be included in the %2nds royalty interest charged against the reserved mineral interest, it did nothing more than attach a real obligation (a portion of the reserved royalty interest) against the immovable property (the mineral servitude) reserved by it in the sale. Such an agreement is clearly authorized by LSA-C.C. Arts. 2010, 2012, 2013, and we cannot see how it can be said to contravene the public policy of the state or be a violation of good morals.
The Viith royalty interest, being a real obligation subject to the prescription of ten years, this prescription has “ * * * the effect of releasing the owner of an estate from every species of real rights, to which the property may have been subject, if the person in possession of the right has not exercised it during the time required by law.” LSA-C.C. Art. 3529; Vincent v. Bulloclq supra. Consequently, when the 4kth royalty interest was extinguished by the lapse of ten years without any production from the land, it did not revert to anyone. It merely ceased to be a burden or charge against the immovable property to which it had been attached, namely, the mineral servitude reserved by Niblett Farms, Inc.
It is argued that by the use of the terms “reversion” and “reversionary interest” in the act of sale of May 11, 1948, in that the %4th royalty would revert to the vendor when extinguished by prescription, was an effort to deal with a reversionary interest contrary to the public policy of the state as established in the case of Hicks v. Clark, 225 La. 133, 72 So.2d 322.
The rule in the Hicks case, to the effect that the reservation of a reversionary interest contrary to public policy will not be recognized, was significantly adopted for the sole purpose of preventing land from being burdened with a mineral servitude for a longer period than ten years without user. This rule reiterates the public policy of the state that the right to explore for oil, gas and other minerals reverts to the hand in the absence of use after the lapse of ten years.
In the instant case, immediately prior to Broussard’s acquisition on May 11, 1948, the only obligation bearing against the land was the outstanding %ith mineral royalty interest. As a result of the reservations mutually agreed upon in Broussard’s acquisition there then came into ex *691 istence new .obligations, namely the mineral servitude (j/£ of the minerals) and a %2nds mineral royalty interest reserved by vendor, Niblett Farms, Inc. It was .expressly agreed and stipulated betweer the contracting parties that the obligations created arising out of the jéith mineral royalty interest would be assumed by vendor and paid out of its %2nds mineral royalty interest. This j&ith royalty interest therefore became an obligation on the part of the vendor to be discharged out of the %2nds royalty interest. Consequently, when the bkth royalty interest, being a real obligation affecting the vendor’s %2nds royalty interest, was extinguished by the prescription of ten years, the vendor’s %2nds royalty reservation was released from and relieved of the obligation, thereby entitling the vendor to the enjoyment of his full %2nds reserved royalty interest and which would necessarily include-the value of the production formerly attributable to the Jkth royalty interest.
The remaining question is whether the acts of acknowledgment executed by the Hawthorne interests on December 8, 1952 (superseded by an act of January 16, 1953), constituted an interruption of prescription running against that part of the bkth royalty interest then owned by David C. Ritchie and Mrs. Gladys R. Burchenal, and now claimed by J. Woodrow Waggoner and Hugh A. Hawthorne.
On December 8, 1952, Harry E. Hawthorne. and Hawthorne, Inc. (successors of Niblett Farms, Inc.) executed an authentic notarial instrument, and superseded by a like instrument of date January 16, 1953, wherein they expressly recognized the acquisition by David C. Ritchie and Gladys R. Burchenal with others from Niblett Farms, Inc., of a %rth mineral royalty interest, of date January 10, 1943, each of the two purchasers having acquired a Ymth interest or an aggregate of 142nd royalty interest. Hawthorne therein declared that he did by that instrument interrupt the prescription and reactivate the existing royalty interest in favor of the therein named royalty owners, and grants to both a full and reactivated ownership for the “longest period allowable by Louisiana Law.” These are the stipulations relied on by the parties for the interruption of prescription.
Article 3520, LSA-C.C., stated that: “Prescription ceases * * * to run whenever the debtor, or possessor, makes acknowledgment of the right of the person whose title they prescribed * * * ”.
In the case of Goldsmith v. McCoy, 190 La. 320, 182 So. 519, 522, quoted with approval in Vincent v. Bullock, supra, we said:
“But article 3520 of the Code * * * does not mean ' that a mere acknowledgment of the existence of the *693 rights of those in whose favor the servitude runs interrupts prescription. There must be more than a bare acknowledgment; the acknowledgment must be accompanied by or coupled ■with the purpose and intention of the party making the acknowledgment to interrupt the prescription then running. ’ ”
A reading of the deed relied on shows that at that time, namely December 8, 1952, there were royalty interests outstanding which, if and when oil or other minerals were produced, were to be paid and accounted for out of the mineral servitude reserved by Niblett Farms, Inc. In this situation the mineral servitude so reserved and subsequently acquired by the Hawthorne interest was a debtor and Ritchie and Burchenal to the extent of a %wth' royalty interest each were creditors, entitled to the amount attributable to their designated interests in the Yzith royalty interest.
We necessarily conclude that the instrument relied on was not a bare acknowledgment. The language contained in the instrument, clearly and expressly acknowledged the existence of the real obligation, •granting to the then owners, now claimed by Waggoner and Hugh A. Hawthorne, á renewal and full reactivation of their ownership, prior to accrual of prescription, so as to constitute an interruption and renewal of the prescription allowable to real .obligations under our law.
The contention that these acts of acknowledgment did not' interrupt prescription, the landowner not having participated in their execution, does not impress us. As previously pointed out, the %tth royalty interest was an obligation to be discharged out of the %2nds royalty interest reserved by Niblett Farms, Inc. Until this Vzith royalty interest had become extinguished by virtue of non-production during a period of ten years, we necessarily concede, as aforestated, that this royalty interest was a burden upon the land, though the obligation to be discharged as aforestated. The agreement of the parties with respect to the %ith royalty interest did not extend the life of vendor’s mineral servitude or reserved royalty interest beyond the normal ten-year period allowed it under our law, however, when the %<tth royalty interest expired as a result of non-production within the ten-year period from date of its creation Broussard’s land became free of the burden affecting it. The obligation of paying the bkth royalty interest being that of Niblett Farms, Inc., when this obligation ceased to exist the obligor, Niblett Farms, Inc., or its assignees, were free to extend the payment thereof at any time prior to its expiration by a formal act of interruption of prescription and the signature or the consent and participation of the landowner *695 was unnecessary. Broussard’s only concern was that after the lapse of ten years his land would be free of the said outstanding royalty interest. Niblett Farms, Inc., or its assignees, being the debtor upon whom rested the obligation, were the only parties necessary to make the acknowledgment constituting an interruption of prescription in the manner required by law. LSA-C.C. Art. 3520.
For the reasons assigned, the judgment of the trial court is reversed and set aside.
It is now ordered, adjudged and decreed that Harry E. Hawthorne, Hugh A. Hawthorne, and J. Woodrow Waggoner be and they are hereby declared to be the owners of the Jkth royalty interest herein in the proportions of %rds, or %oth royalty interest, to Harry E. Hawthorne; % th, or Viath royalty interest, to Hugh A. Hawthorne; and Ye th, or Ymth royalty interest, to J. Woodrow Waggoner.
It is further ordered that the Clerk of Court turn over to the aforementioned owners in the above proportions the $5,532.51 deposited in the registry of the court, which amount represents the value attributable to the Yzith royalty interest as of April 20, 1955.
It is further ordered that Union Oil & Gas Corporation of Louisiana, holder of the mineral leases on the lands involved herein, subject to the mineral royalty interests involved in this concursus, be and it is hereby relieved of all liability ior the payment of the money deposited in this concursus and for all costs of these proceedings.
All costs are to be assessed in accordance with the provisions of Act 123 of 1922, as amended, LSA-R.S. 13:4816.

. As we recently restated in description of the mineral royalty interest involved in Union Sulphur Co. v. Andrau, 217 La. 662, 666-670, 47 So.2d 38, 40, such an interest “imposed on the property a real obligation, since it was attached to an immovable, and passed with the property, conditioned upon the production of oil and gas or other minerals; but if such condition did not happen within ten years, such royalty interest was lost by the prescription of ten years”; “the right of the owner of such an interest ‘is restricted to a sharing in production if and when it is obtained by the landowner or a lessee.’ ”