LANDRY, Judge.
This concursus proceeding invoked by Exchange Oil & Gas Company, lessee of defendant Murphy J. Foster and his co-owners of Dixie Plantation, situated in St. Mary Parish, seeks to determine ownership of oil royalties due by virtue of mineral operations conducted on the property. The dispute, between the landowners and certain royalty owners, presents the single issue, namely, whether production from a well located on a part of Dixie Plantation situated within a Commissioner’s compulsory drilling unit interrupted prescription as to the remainder of the plantation located outside the confines of the Commissioner ordered unit. Defendants-landowners appeal the judgment of the trial court rejecting their plea that the royalty interests on that portion of the property outside the unit had prescribed for 10 years non-use. We affirm the decision rendered below.
The stipulated facts are that in 1953 and 1954 the Foster Group, owners of Dixie Plantation, conveyed certain royalty interests therein to W. C. Proctor and Harold T. Shalett, respectively. The Proctor interest is now held by four individuals as trustees for numerous other parties who shall be collectively entitled the “Proctor Group”. The Shalett interest is presently owned by Shalett’s heirs and assigns who shall be denominated the “Shalett Group”.
On or about August 21, 1955, Latex Oil & Gas Company, lessee of the Fosters, completed a producing well on Dixie Plantation. The well, known as the Rose K. Foster Well # 1, produced oil in paying quantities until on or about August 13, 1965. By order No. 274-A, dated March 22, 1956, effective April 1, 1956, the Commissioner of Conservation unitized that portion of Dixie Plantation on which was situated the Rose K. Foster Well # 1 with surrounding properties. The unit thus created was designated Unit J. A second well drilled by Latex on Dixie Plantation produced intermittently from January 18 to April 23, 1956, and thereafter produced nothing. By Commissioner order this well became the unit well for Unit K formed by the Commissioner. Both the Proctor and Shalett Groups have received royalties from the Unit J and Unit K wells from the date of their completion until abandonment..
On February 1, 1965, Exchange obtained a mineral lease on Dixie Plantation and pursuant thereto, on April 25, 1966, completed a well thereon which commenced producing gas on November 22, 1966. This well, known as the Murphy J. Foster No. 1 Well, is not situated within the limits of either Unit J or K.
Exchange has deposited the sum of $28,929.65 in the registry of the Court, said amount being the royalty due on the Murphy J. Foster Well No. 1 through January, 1968. The Foster Group claims the entire 19/640 royalty interest; the Proctor Group demands 13/640; the Shalett Group asserts ownership of 6/640.
The trial court held that production from the Unit J and Unit K Wells located on part of the Dixie Plantation interrupted prescription on the Proctor and Shalett Royalty interests from August 25, 1955, until August 13, 1965, on all parts of the plantation whether within or without the Commissioner’s compulsory units on which the wells were physically located. In effect the trial court held that Trunkline Gas *906 Company v. Steen, 249 La. 520, 187 So.2d 720, which involved mineral rights and not royalty interests, was nevertheless apposite and controlling. Appellants-landowners maintain that the lower court erred in (1) holding that production from a unit tract through a well located on that tract has a nature and legal effect different from production from a unit tract through a unit well located on another tract in the unit; (2) failing to follow and apply the rule governing the effect of production from a unit tract on the running of liberative prescription as established in Childs v. Washington, 229 La. 869, 87 So.2d 111; Jumonville Pipe & Machinery Co. v. Federal Land Bank, 230 La. 41, 87 So.2d 721, and Frey v. Miller, La.App., 165 So.2d 43, writs refused, 246 La. 844, 167 So.2d 669, and (3) holding on the authority of Trunk-line, above, that the effect of production from a well on part of a mineral royalty tract in a Commissioner’s Unit has the same effect on the running of liberative prescription on a royalty interest as drilling has upon the running of liberative prescription on mineral rights under similar circumstances.
The question, namely, does production on part of a parent tract, situated in a Commissioner’s Unit, interrupt the running of prescription against royalties on that portion of the parent tract situated outside the unit, appears res nova. A review of the jurisprudence on the question of interruption of prescription on mineral and royalty rights appears necessary.
In Elson v. Mathewes, 224 La. 417, 69 So.2d 734, Mathewes sold Elson a ½ mineral interest in a 91 acre tract. Mathewes leased the entire 91 acres to Arkansas Louisiana Gas Company. Elson leased 40 of the 91 acres to the same lessee. The parties then voluntarily pooled the 40 acre tract with other properties. A producing well was brought in on the unit but not on the 40 acres owned by Mathewes. The question presented was whether the running of ten years prescription against El-son’s Y2 mineral rights in the 51 acres not included in the unit was interrupted by inclusion of the 40 acre tract in a producing unit. The Court noted that the sale of the mineral right established an indivisible servitude in favor of the mineral grantee in the sense that the landowner may not thereafter independently contract with a third party to effect a division of the resulting servitude to the disadvantage of the mineral assignee. The court found, however, that by the terms of the unitization agreement, the landowner and mineral owner agreed to a division or reduction of the servitude to the 40 acre tract inasmuch as the agreement applied solely to the 40 acres and made no mention of the remaining 51 acres. In effect the Court held that prescription ran against the mineral rights to the 51 acre tract as it was separate from the 40 acre plot on which there alone had been an interruption of prescription by virtue of its inclusion in a unit upon which production occurred. Elson, above, establishes the rule that where a voluntary pooling agreement fails to mention part of a servitude not included in the unit, a division or reduction of the servitude results. The effect of such reduction, according to Elson, is that production within the unit but off a tract included therein, interrupts prescription only on that portion of the tract situated within the unit.
In both Childs v. Washington, 229 La. 869, 87 So.2d 111, and Jumonville Pipe and Machinery Co., Inc. v. Federal Land Bank of New Orleans, et al., 230 La. 41, 87 So.2d 721, both involving mineral rights, a Commissioner’s order establishing a unitized pool was deemed to have divided a servitude which was partially within and partially without the unit. In each instance it was held that production within the unit but off the parent tract interrupted prescription on that portion of the servitude within the unit but not as to the remainder of the parent tract located outside the unit. In Childs, above, the court reviewed the jurisprudence which establishes the indivisibility of servitudes insofar as concerns the owner of the servient estate and the divisibility of servitules insofar as *907 concerns the rights flowing to the holder of the servitude. The Court quoted at length from Elson, above, and noted that the provisions of our conservation laws become part of the mineral contract, one such provision conferring pooling authority upon the Commissioner. The Court next observed that if land and mineral owners can contract to reduce so as to apply the servitude as to a portion only of the acreage without thereby interrupting the tolling of prescription as to the servitude on the remainder as held in Elson, above, the Commissioner’s order produces the same effect. In this regard, the court stated:
“It logically follows, therefore, that if the landowner and the mineral owner can by agreement extend the servitude as to a portion only of the acreage without by such act interrupting the tolling of prescription as to the servitude on the remainder of the tract, as held in Elson v. Mathewes, supra, and if the mineral owner can divide the advantages of a servitude by assigning to a third person all of his interest in a designated portion of the land affected by the servitude and create a situation whereby user of a portion would not hold the remainder, as held in Ohio Oil Co. v. Ferguson, [213 La. 183, 34 So.2d 746] supra, and Byrd v. Forgotson [213 La. 276, 34 So.2d 777] supra, then clearly when the Commissioner of Conservation, acting for the State in the exercise of its police power, by his orders and after due hearing, included within a unit or units portions of a tract as to which owners had failed to agree to pool their interests for development purposes, his act produced the same result as if the parties had formed a drilling unit by convention and for development purposes had reduced the servitude to that extent.”
In Jumonville, the Court again reviewed the Civil Code Articles governing servi-tudes. Especially noted were Article 789 which provides that servitudes prescribe for 10 years non-user; Article 656 which states that servitudes are not divisible; Article 657 which reiterates that though servitudes are not divisible and must be established for the whole and not the part, nevertheless there is no prohibition against divisibility of the advantages flowing to the holder if such advantages be susceptible of division. Next the Court observed that Act 157 of 1940, whose purpose is to prevent waste and conserve natural resources, has been held constitutional in Hunter Co., Inc. v. McHugh, 202 La. 97, 11 So.2d 495. Next the court cited LeBlanc v. Danciger Oil & Refining Co., 218 La. 463, 49 So.2d 855, to the effect Act 157 of 1940 never intended that a Commissioner’s order have any effect beyond the limits of the unit fixed by the Commissioner after hearing as provided in the statute. Following this, the Court quoted from the Commissioner’s order language indicative of the Commissioner’s intent to limit the effect of his order to the property within the unit. On this basis the Court held that the order effected a reduction of the bank’s mineral reservation and extended prescription as to those portions of the seven subject tracts situated within the Commissioner’s unit. As to the remaining portions of the tracts situated outside the unit, prescription was held to have run. It would appear that the net effect of Jumon-ville, above, was to hold that a Commissioner’s order for pooling produces the same result as a conventional agreement of the type involved in Elson, above, namely, it reduces the servitude for development purposes to the property actually included within the unit.
The question in Crown Central Petroleum Corp. v. Barousse, 238 La. 1013, 117 So.2d 575, was whether royalty rights prescribed as to that portion of a parent tract outside a voluntary unit because the producing well was not situated on that part of the parent tract inside the unit. As in Elson, the pooling agreement was silent as to the portion of the parent tract not included in the unit. In Crown, above, the Court first reviewed the basic difference between mineral and royalty rights as es *908 tablished by the jurisprudence. Next it rejected the contention that the owner had interrupted prescription by acknowledgment. The Court then observed that the lease in question authorized pooling by the lessee and stated that any operation or production on any unit tract would be considered as though carried on or produced from land covered in the lease whether or not the well was actually located on the lease. Citing Boddie v. Drewett, 229 La. 1017, 87 So.2d 516, the Court considered such a provision unnecessary, as the quoted authority held that “an actual use of the minerals occurs when they are extracted from under the land, and hence it is immaterial whether the operations are conducted on the land burdened by the servitude or from without.” The Court reasoned that production from the unit interrupted prescription as to all of the tract unless the agreement reflects, as in Elson, above, that the parties intended to conventionally divide the servitude. A detailed analysis of Elson followed, after which the Court found Elson, above, was not controlling because the agreement in Crown showed no intent on the part of landowners and royalty owners to divide the servitude. Apparently, failure of the agreement to mention that portion of the parent tract outside the unit, a fact deemed operative in Elson, was considered of no effect in Crown. Rather, Crown further distinguished itself from Elson by noting that in Elson the unitization agreement was between the landowner, royalty owners and lessees, while in Crown the contract was between the lessees and royalty owners whether or not the latter were landowners. Immediately thereafter, the Court in Crown appears to have negated the foregoing distinction by noting that royalty owners who have no interest in the land are not necessary parties to a pooling agreement. Further noting that such a royalty owner has no bargaining power, the Court proceeded to indicate that it is doubtful whether an agreement, between a mere royalty owner and land owner to divide the servitude would be enforceable. In this regard we note the following in Crown:
“Even were we to regard the unitization agreement as an arms length contract between the landowner and royalty owners, in which the latter consented to divide their royalty interest, it is doubtful whether such a concession, being without any consideration whatsoever, could be legally enforced.”
Finally, in Crown the Court held that Childs and Jumonville were inapplicable because the cited authorities dealt with forced unitization. The court concluded that production within the voluntary unit but off the parent tract interrupted prescription as to royalty rights on that part of the parent tract situated outside the unit.
Prescription of royalty interests on that portion of a parent tract outside a Commissioner’s compulsory unit where there was unit production off the parent tract was the issue in Frey v. Miller, La.App., 165 So.2d 43, (Third Circuit), writs denied 246 La. 844, 167 So.2d 669. It was held that such production interrupted the running of prescription of royalty rights on the entire parent tract. On rehearing the court properly pointed out that since preservation of royalty rights depends upon production, the issue is does production from a unit well off the parent tract interrupt prescription as to the portion of the tract outside the unit? The court then noted that the purpose of unitization as authorized by R.S. 30:9, Sub. C (as amended in 1960) is to prevent waste and promote conservation. Also noted was the fact that R.S. 30:10 Sub. (A), (1) (b) provides that the portion of production allocated the owner of each tract under a Commissioner unitization is considered as though produced from a well drilled on each tract. Therefore, the court reasoned, that for purposes of production, it was just as though the well were drilled on the parent tract. In determining the effect of such production the court held that Childs and *909 Jumonville, above, were dispositive of the matter. The court also noted that its original decision was based on Crown, above, which involved conventional pooling and not a commissioner unit. It further noted that the original decree conflicted with Childs and Jumonville. The court held that Childs and Jumonville impelled the holding that the Commissioner’s compulsory unit divided the servitude at least for the purpose of determining the issue of prescription even though under R.S. 30:10 production from a unit well off a parent tract is considered as production from each tract in the unit. Therefore the court found that production in the unit off the parent tract did not interrupt prescription on the royalty interest on that part of the parent tract outside the unit. Frey also cites language in Crown, above, which concedes the possibility of application of the Childs and Jumonville holdings where a royalty is involved in the event a compulsory unitization occurs. Childs and Ju-monville were then distinguished from Crown, not on the basis that the former involved a servitude and the latter royalty rights, but on the ground that Crown did not involve compulsory unitization. The court then observed the result reached is compatible with the policy implicit in Childs and Jumonville to the effect that traditional civilian policy calls for a restrictive interpretation of interests which limit the full ownership of property and its free flow in commerce.
Trunkline Gas Co. v. Steen, 249 La. 520, 187 So.2d 720, posed the question whether prescription affecting mineral servitude rights on that part of a parent tract situated outside a Commissioner’s unit was interrupted by drilling on that portion of the parent tract inside the unit. The court noted that the provisions of R.S. 30:2-30:-20, which provide for Commissioner units, expressly state that any order infringing on property rights or restricting the contractual rights of owners shall guarantee each owner participation in production to the extent that his portion of property is included in the unit. Noting that the statute authorizes forced unitization in the interest of conservation and prevention of waste, the court expressed the opinion that any order of the Commissioner not necessary in the interest of conservation or prevention of waste and which would deprive an owner of his rights would be illegal. The court then expressly stated it interpreted Childs to mean that the Commissioner’s orders are effective and valid only insofar as they tend to protect and conserve natural resources. On this premise, it was held that the only effect of the Commissioner’s order was to deprive the servitude owner of the right to conduct drilling operations on that portion of the parent tract in the unit but that the order did not deprive or in any way conflict with the servitude owner’s right of ownership or any benefits flowing to him from the drilling of wells on the parent tract.
Appellants maintain the trial court erred in holding that production from a unit well on part of a parent tract in a compulsory Commissioner’s unit has a different and greater effect than production from a well in such a unit but off the parent tract. Appellants maintain that it matters not whether the well is located on or off the parent tract, its effect is the same. The position is based on the provisions of LSA-R.S. 30:10, subd. A (1) (b) as interpreted by Everett v. Phillips Petroleum Co., 218 La. 835, 51 So.2d 87, and Boddie v. Drewett, 229 La. 1017, 87 So.2d 516, which state that production from a unit well is the equivalent of actual production from each tract in the unit. Therefore, according to counsel, there can be no difference in the effect of production whether from a well on or off a parent tract in a compulsory Commissioner’s unit. On this premise, it is claimed that since Childs, Jumonville and Frey, above, held that production off a parent tract in a unit had no effect on that portion of the parent tract outside the unit, the instant case is indistinguishable from Childs, Jumonville and Frey as a consequence of which those authorities are controlling herein.
*910 Citing LSA-R.S. 30:10, subd. A(l) (b) and noting the effect attributed to a compulsory Commissioner’s order in Childs, Jumonville and Frey, appellants maintain that the divisive effect of such an order is predicated upon considerations of conservation and prevention of waste. In this connection it is expressly stressed that no such divisive effect could flow from a Commissioner’s order unless the purpose of the order is to promote conservation and prevent waste. It is next contended that since there is no statute evidencing a real-tionship between drilling and conservation, drilling is totally unrelated to conservation as a consequence of which the effects of drilling cannot be influenced by a Commissioner’s order. Finally, appellants maintain that Trunkline, which held that a Commissioner’s order could not influence the effects of drilling, is not applicable herein because Trunkline involved the effects of drilling as distinguished from the effects of production.
As contended by appellants, LSA-R.S. 30:10, subd. A(l) (b) provides that production from a unit well is allocated to the owner of each tract in the unit as though the well were situated upon his tract. The statute recites as follows:
“(b) The portion of the production allocated to the owner of each tract in a drilling unit formed by a pooling order shall, when produced be considered as if it had been produced from his tract by a well drilled thereon.”
We note initially that the statute expressly prescribed the effect which production on one tract in the unit has upon those portions of all other tracts therein but is silent as to the effect production on a given tract in the unit will have upon those portions of other tracts outside the unit. We believe such silence justifies the inference that production on a given tract in the unit, though having the effect of actual production on those parts of all other tracts in the unit, has no effect on those portions of such other tracts as lie outside the unit. We likewise note the statute is mute as to the effect to be given actual production occurring on the parent tract in the unit upon that portion of the parent tract situated outside the unit. Finally, we note that the statute gives no indication as to what effect production occurring on that portion of a parent tract outside a unit shall have upon the part of the parent tract mside a unit.
Both Childs and Jumonville, above, rely upon and apply the rule announced in El-son v. Mathewes, above. In Elson, we note the following:
“A grant by a landowner of a mineral interest, under the established jurisprudence of this court, does create a servitude which is indivisible in the sense that the grantor thereafter cnnnot contract independently with a third person to effect a division of that servitude to the disadvantage of the mineral owner. But there is no law prohibiting the landowner and the mineral owner from entering into a contract with each other, as was done by and between these litigants, whereby a division or a reduction of the servitude results.
Here, plaintiffs and the defendant, in the unitization and pooling contract, agreed to an interruption of prescription as to the 40-acre tract within the Dowl-ing Unit, thereby extending the servitude as to it. However, the agreement made no mention of, and did not relate to, the remaining 51 acres (involved in this suit); and this omission along with the failure to drill on or otherwise use the 91 acres during the prescriptive period, resulted in 1947 in an extinguishment of the servitude to such extent.” (Emphasis by the Court.)
The language in Childs indicates its reliance to some extent upon Elson, above. We observe, however, that Childs, unlike Elson, does not employ the term “a division or a reduction of the servitude results”, but states that the Commissioner’s order “produced the same result as if the *911 parties had formed a drilling unit by convention and for development purposes had reduced the ■ servitude to that extent.” (Emphasis by the Court.)
Jumonville notes that the Commissioner’s order therein provides that drilling operations, drilling, and production on any tract in the unit shall constitute drilling operations, drilling, and production under the terms of each and every lease and sublease affecting the property in the unit. The Court then observed that by its express, language the effect of the order in Jumon-ville could not apply to acreage outside the unit. The Court then noted that the order created no obstacle to the mineral owner’s use of the acreage outside the unit in the manner contemplated by the mineral reservation and further that the order could not have the slightest effect upon the mineral owner’s rights in this regard. Then the court in Jumonville stated :
“Therefore, the orders of the Commissioner of Conservation had the effect of reducing the acreage covered by the original mineral reservation by the Federal Reserve Bank and extending the prescription as to the portions of the seven tracts included within Pooling Units No. 3 and No. 5. However, the prescription provided by the articles of the Revised Civil Code, cited supra, is applicable to the mineral servitude existing on the portions of plaintiff’s seven tracts located outside of the pooling units. See, Ohio Oil Co. v. Kennedy, La.App., 28 So.2d 504, certiorari denied, which held that Act No. 157 of 1940 did not repeal the articles of the Civil Code with respect to prescription.”
Immediately following the above cited language, Jumonville then proceeds to cite the hereinabove quoted language from Childs, following which it states:
“Therefore, it should logically follow that the mineral servitude on the portions of the seven tracts included in Orders Nos. 131-3 and 131-5 has been extended by production and kept alive. The servitude on the portions of the seven tracts not included in the orders have become extinguished because of non-use during ten years.”
It appears that Childs and Jumonville stand for the proposition that a compulsory Commissioner’s order reduces the acreage covered by a mineral servitude to that portion of the servitude included in the unit; consequently, separate user is required to prevent the running of prescription on that portion of the servitude outside the unit. Nevertheless, the above cited language in Jumonville establishes that the rules of prescription provided for by the Civil Code apply as to those portions of a servitude tract outside a Commissioner’s unit because Act 157 of 1940 does not repeal the Civil Code Articles governing prescription.
Trunkline, above, compels a reevaluation of Childs and Jumonville, considering Trunkline extends the effect of drilling on a unit tract to that portion of the unit tract lying outside a compulsory unit. While we believe the Supreme Court was meticulously careful not to overrule Childs and Jumonville in the Trunkline decision, it is significant that Trunkline declares:
“We do not think a review of the Childs and Jumonville cases and the precedents upon which they were based supports the contention of Group Two that the issuance of the order by the Commissioner creating a forced unit, including a portion of a tract upon which a servitude is imposed, has the effect of dividing that servitude into two separate servitudes each requiring separate user for its continued existence.”
The opinion in Trunkline concludes with the following:
“Applying the foregoing pertinent articles of the Code by analogy to the facts of this case, as was done in the foregoing case, it cannot be said the 1949 servitude created in favor of Group One was divided. Since it is only to the extent that it is necessary to protect, conserve *912 and replenish the natural resources of this State and to prevent their waste that one’s right to property, either as owner or under contract, must yield to the Commissioner’s power, it necessarily follows that the only effect the Commissioner’s Orders of 1959 creating Unit No. 2 had was to deprive Group One of their right to go upon the land and conduct' drilling operations on that particular portion of the parent tract included in the unit; but these Orders did not deprive or in any way conflict with Group One’s right of ownership or any benefits flowing from the wells drilled on the parent tract.
We therefore conclude the good faith drilling operations on the parent tract in Unit 2 had the effect of interrupting the running of prescription on the entire tract, just as if there had been no compulsory Commissioner’s unit in existence.”
The foregoing language states in unmistakable terms that the Commissioner’s order does not “divide” the servitude. It then points out that since the Commissioner’s order is valid only to the extent that it is required to conserve minerals and prevent their waste, property rights, whether by ownership or contract, are required to yield to such an order only to the extent conservation is thereby served. Therefore, the sole effect of a compulsory order is to deprive the owner of mineral rights of the privilege of conducting drilling operations on that portion of the servitude tract within the unit. The order does not, however, in any way deprive or conflict with the benefits flowing to the owner of mineral rights by virtue of the drilling of a well on the parent tract.
There can be no conflict between the holding in Trunkline and LSA-R.S. 30:10, subd. A(l) (b) because the statute does not even purport to govern the effect which drilling or production on that part of a parent tract in the unit shall have on that part of the parent tract outside the unit.
It appears the reason a compulsory order cannot arbitrarily divide a servitude tract is that contracts between landowners and servitude and royalty owners contemplate that use (drilling etc.) or production interrupts prescription on servitude and royalty interests, respectively, as to the entire tract on which the servitude or royalty exists. Unquestionably this is the long established jurisprudence of this state. Lee et al. v. Giauque, 154 La. 491, 97 So. 669; Continental Oil Co. v. Landry et al., 215 La. 518, 41 So.2d 73. Such contract rights and privileges as normally flow from agreements of this nature cannot be arbitrarily disturbed or infringed upon by granting a Commissioner’s order divisive effect where the parties themselves had no such intention, excepting only those instances where the disturbance or infringement is justified in terms of conservation and waste prevention. The unmistakable holding in Childs, Jumonville and Frey is that the effect on prescription of production within a compulsory unit is limited to the unit area. In Elson and Crown the rule was announced that the effect of production on prescription in a voluntary unit was to be extended or increased and applied to property outside the unit on the theory that where the parties in such a un-itization agreement do not expressly limit or restrict the effect of production, maximum application and effect shall be attributed to production. Thus it appears the cases have established conflicting policies regarding the effect flowing from production within a unit to property situated outside the unit. This lack of uniformity tends to suggest absence of conservation interests to be served outside the unit. It follows therefore that a compulsory Commissioner’s order cannot affect properties situated outside the unit since no valid conservation measure is thereby served.
We believe therefore that Trunkline does not alter the result reached in Childs, *913 Jumonville and Frey, but only the underlying reasons in Childs, Jumonville and Frey. The result in Childs, Jumonville and Frey was that production in a compulsory unit off a parent tract would be given no effect on that portion of the parent tiact outside the unit. This accords with the proposition that outside a compulsory unit, no conservation purpose is served consequently the compulsory order cannot affect rights as to properties outside the unit. This interpretation also accords with the general rule that the property owner and servitude owner contemplate a use occurring on the servitude tract and do not, in the absence of voluntary unitization, intend that any exercise of mineral rights on other properties will affect their respective interests. These mutual rights, Trunkline clearly states, must be respected and preserved except insofar as conservation dictates to the contrary.
We have previously shown that LSA-R. S. 30:10, subd. A(l) (b) specifically states what effect production within a unit shall have on all other properties within the unit and that the inference is that production shall have no effect on lands outside the unit.
We are impelled to resolve the seeming contradiction that production inside a unit is limited to the property in the unit as held in Childs, Jumonville and Frey, and the terms of the statute which prescribed that production on one tract in the unit is considered actual production the same as if a well were drilled on each tract. In our view, the answer lies in Trunkline whose net result, we believe, limited the effect of production from a unit well to the unit area. Conceding production is real and actual from each tract in the unit, nevertheless, Trunkline expressly states the effect thereof cannot extend beyond the unit if such extension will in any way infringe upon contractual rights.
For LSA-R.S. 30:10, subd. A(l) (b) to have any valid effect outside a unit, some conservation measure must thereby be served. It has been demonstrated that no conservation measure or purpose exists without the unit. Plaintiff’s argument requires that production anywhere in a unit be deemed actual production on the parent tract. We believe a literal application of this principle would render the statute unconstitutional. To so hold would mean that production from any tract in the unit, being actual production from all tracts therein, must of necessity interrupt the running of liberative prescription of royalty rights on all portions of the unit tracts outside the unit. This would extend the effect of the Commissioner’s order to properties outside the unit where no conservation necessity exists and would render such an order unconstitutional. It is elementary law that a statute must be construed to be constitutional, if possible. This consideration impels rejection of plaintiff’s argument.
We believe it follows that if the statute contemplates production from any tract is the equivalent of actual production from each and every tract in the unit, the effect of such production must be restricted to the unit area.
We believe Trunkline accords with the foregoing interpretation since the clear import of that decision is that absent a conservation motive, the contractual rights of the parties respecting property outside the unit cannot be favorably or unfavorably affected by a Commissioner’s order. Trunkline further holds that upon the occurrence within the unit of an operative factor contemplated by the parties, the effect thereof on the running of prescription on property outside the unit is precisely the same as if there were no such order. Granted that Trunkline involved drilling whereas we are here concerned with production, we see no distinction on this basis. The operative factor here was production on the parent tract. If there were no Commissioner’s order, such production would interrupt prescription on the entire parent tract.
*914 We are of the opinion that Crown, above, is indistinguishable from Elson, above, on the basis of the language contained in the respective pooling agreements. We likewise note that in Crown, the Court expressly rejected the premise that the language in the leases, royalty agreements, and pooling contracts, was the decisive and controlling factor. In this regard, Crown ignores the fact that the pooling agreement therein involved did not mention the effect production or drilling would have on that portion of the parent tract outside the unit, which exact same circumstance was present in Elson. In Crown, the Court also declined to find that the agreements in question indicated positive intent on the parties’ part to extend the effects of production so that part of the parent tract outside the unit.
Despite a detailed discussion of the matter of the intent of the parties in instances of this nature, the Court in Crown proceeds to negate the efficacy of such agreements between royalty owners and landowners, insofar as the rights of royalty owners are concerned, as indicated in the language hereinabove quoted.
Recapitulating, we find that Crown pays lip service to the rule in Elson that when the agreement is silent as to lands outside the unit, the servitude is deemed to have been divided and the effect of its use limited to that part of the servitude within the unit. Crown then finds an absence of an intent to divide, which conclusion appears without foundation in view of the rule of interpretation laid down in Elson.
The foregoing impels us to conclude that Crown rejects the language of the contracting parties as the basis for its decision. If this analysis be correct, Crown stands postulated on the policy election of preserving the rights of royalty owners against landowners. The policy is justified on the ground that since a royalty owner is not a necessary party to a pooling agreement, the courts will zealously protect his rights. We can perceive justification for such a policy determination which protects the royalty owner to the extent of his legitimate contractual expectations. Such a policy cannot, however, be justified insofar as it may afford a royalty owner rights greater than those contemplated in his separate and independent contract with the landowner. We are of the view that the royalty owner should not be denied the capacity to contract in this area. We are also of the view that when it is found that the royalty owner has so contracted, effect should be given to the agreement according to the intent of the parties as determined in each case.
We believe Crown cannot be reconciled with Trunkline insofar as Crown proclaims a policy which bestows on royalty owners rights exceeding their legitimate contractual expectations. In this respect, we share the views expressed by Justice Hawthorne in his dissent in Crown. The unmistakable holding in Trunkline is that the contractual expectations of those dealing in mineral rights can neither be enhanced or diminished, absent a conservation purpose. It would appear that Trunk-line, by implication at least, has reversed Crown insofar as Crown extends the rights of royalty owners outside a unit where no conservation purpose is served.
In holding that production within a compulsory unit is limited to the unit area, Childs, Jumonville and Frey in effect recognized and applied the rule that facilitates and promotes running of prescription as to properties outside the unit in line with the policy of restrictive interpretation of interests which limit the full ownership of property and its free flow in commerce, as was held in Elson and the authorities therein cited. Crown obviously proclaimed a contradictory policy in apparent justification of protection of the interests of royalty owners whose rights depend solely upon production, which in turn is contingent upon the actions of the landowner and mineral owner. The rationale of Crown is that since a royalty owner is not a neces *915 sary party to a pooling agreement, the law protects his interest by limiting the effect of the landowner-mineral owner agreements upon the running of liberative prescription against royalty rights. Based solely on his ownership of a pure royalty interest, the royalty owner has no right to expect that production on other properties will interrupt prescription of his royalty interests. In giving the royalty owner the benefit of production on other properties both as to his royalty interests within and without the unit, Crown appears to have done violence to the policy of interpretation which facilitates and extends the running of liberative prescription against outstanding mineral rights.
In maintaining the efficacy of Childs, Jumonville and Frey, the Supreme Court in Trunkline applied a policy of liberal interpretation of liberative prescription which facilitates the running of prescription against outstanding mineral rights. The result in Trunkline does not contravene this policy because Trunkline merely recognizes that existing contract rights are not affected by a compulsory Commissioner order and that operative factors within the unit are given effect outside the unit the same as if the order did not exist.
Appellant’s argument that the public policy of that state has not decreed the necessity for uniformity in the rules governing liberative prescription of mineral servi-tudes and mineral royalties is dually based. First, it is contended the position is supported by the jurisprudence which held in effect that a royalty interest should not survive the loss of a mineral servitude. Continental Oil Co. v. Landry, 215 La. 518, 41 So.2d 73. Secondly, it is contended the position is consistent with the policy of freeing land by liberative prescription from the effects of dormant mineral interests.
We note that Frey expressly holds that in the absence of a clear expression from the Supreme Court to the contrary, uniformity should be the rule. On this express premise Frey applied to royalty rights the same rule applied to servitude rights in Childs and Jumonville. The Supreme Court’s refusal of writs in Frey appears to have endorsed at least the result reached in Frey. We are in agreement with Frey as regards both the reasons therein expressed and the result reached. Consequently, we deem the rule announced in Trunkline to be applicable to and dispos-itive of the case at bar.
The judgment of the trial court is affirmed at appellant’s cost.
Affirmed.