476 So.2d 1031 (1985)
SHELL OIL COMPANY, Plaintiff-Appellee,
v.
Katharine S. PITMAN, et al., Defendants-Appellants.
No. 84-611.
Court of Appeal of Louisiana, Third Circuit.
October 10, 1985.
*1032 Onebane, Donohoe, Bernard, Torian, Diaz, McNamara & Abell, Edward C. Abell, Jr., Lafayette, for defendants-appellants.
Larry M. Roedel and Howard Smith, Liskow and Lewis, New Orleans, for plaintiffappellee.
John M. Roper, New Orleans, Jacques J. Cousin, New Iberia, Ogden, Ogden and McCune, William B. Ogden, Doyle, Doyle and Doyle, Donald W. Doyle, New Orleans, for defendants-appellees.
Before GUIDRY, LABORDE and KING, JJ.
KING, Judge.
The issues presented on this appeal are the correctness of the trial court's finding of fact that a waterway traversing contiguous tracts of land, which waterway physically divided the tracts of land, is not navigable and that mineral production on one contiguous tract of land interrupted prescription on the mineral royalty interest on the other contiguous tract of land where there was one royalty deed covering both tracts of land.
Shell Oil Company (hereinafter Shell) filed a petition in concursus to obtain a resolution of a dispute over ownership of royalties from certain drilling operations conducted by Shell. Shell named many defendants, all of whom were considered to be members of one of two groups; namely, the purchasers of certain royalty interests or their legal successors (hereinafter referred to as the McSpadden Group), and the sellers of certain royalty interests or their legal successors (hereinafter referred to as the Smith Group).
After a trial on the merits the trial court rendered judgment in favor of the McSpadden Group, defendants-appellees, and against the Smith Group, the defendantsappellants. The trial court found that the waterway traversing the property was not presently navigable and that there was no evidence of its existence or navigability in 1812, thus the State of Louisiana did not own the waterbottom. The trial court further found that even had the waterway been navigable, the jurisprudence prior to the enactment of the Louisiana Mineral Code was such that unit production from a portion of the royalty tract, on the land north of the waterway, was sufficient to interrupt prescription with regard to the entire royalty tract and that the Louisiana Mineral Code could not be applied retroactively to divest the owners of this vested royalty interest acquired under the jurisprudence.
The Smith Group, defendants-appellants, timely appeal assigning as error that the trial court erred in:
(1) Finding that the waterway was presently non-navigable; and
(2) Finding that the waterway was non-navigable in 1812; and
(3) Basing its determination of navigability, for the purpose of determining contiguity of tracts of land, on the present navigability of the waterway rather than on its navigability in 1812; and
(4) Applying the jurisprudential rule of Crown Central Petroleum Corporation v. Barousse, 238 La. 1013, 117 So.2d 575 (La.1960), rather than retroactively applying Article 89 of the Louisiana Mineral Code.
We affirm the decision of the trial court for the reasons hereinafter set forth.

FACTS
Shell purchased a mineral lease from John Augustine Smith, et al., as lessors, (predecessors in title to the Smith Heirs hereinafter referred to as the Smith Group) on December 7, 1934, which covered in part the following described property in Iberia Parish, Louisiana, to-wit:
(a) The West Half of the Southwest Quarter of Section 20, Township 14 South, Range 7 East, and the South Half of the Southeast Quarter of fractional Section 19, Township 14 South, Range 7 East; and
(b) The East Half of the Southwest Quarter of Section 20, Township 14 South, Range 7 East.
*1033 Subsequent to the above described lease of minerals to Shell, the Smith Group sold portions of their undivided royalty interest, primarily in the years 1945 through 1949, which the Smith Group had retained under the terms of their lease to Shell, to C.C. McSpadden (predecessor in title to the royalty owners hereinafter referred to as the McSpadden Group).
Two voluntary units were formed on the lands covered by the original Shell lease from the Smith Group. In April, 1949 a voluntary unit was formed which was designated as Unit D. This unit included the Northern portion of the West Half of the Southwest Quarter of Section 20 and the Southeast Quarter of Section 19. In February, 1951 another voluntary unit was formed which was designated as Unit E, south of and contiguous to Unit D, and included the Southwest Quarter of Section 20 and the Southeast Quarter of Section 19. Unit D is completely traversed by a waterway that generally runs in an east-west direction. The remainder of the land contained in Unit D and the entirety of the land contained in Unit E lie south of this waterway.
In 1954 production in Unit D began. All of the wells in Unit D are located in or on the north side of the waterway traversing the Unit. All of the parties agreed that this production on Unit D clearly interrupted prescription on the royalty interest sold by the Smith Group to the McSpadden Group insofar as the royalty interest under the lands included in Unit D. The production of minerals from Unit D began in 1954 and continues to this date.
The production of minerals from Unit E began in October, 1960 and continues to this date. For a number of years royalties on the production from the lands contained in Unit E were paid to and received by the various record owners without controversy until the filing of this concursus proceeding in 1982. Subsequent thereto, the royalties have been deposited in the registry of the court in this concursus proceeding. After the decision of the Louisiana Supreme Court in Gulf Oil Corporation v. State Mineral Board, 317 So.2d 576 (La.1975), which changed the previous Louisiana jurisprudence regarding ownership of navigable waterbottoms, the Smith Group first began to contend that the royalty interest which they had sold to the McSpadden Group some thirty years before had prescribed for non-use as to that part of the royalty interest under the lands included in Unit E and lying south of the waterway. The Smith Group contends that there has been no production from the lands included in Unit E, or from land contiguous thereto south of the waterway, for a period in excess of ten years or at any time prior to October, 1960. They make this argument on the theory that there exists and has existed since 1812, a navigable waterway that allegedly completely traverses Unit D, in an east-west direction, and that the title to this waterway is vested in the State of Louisiana. The Smith Group argues that state ownership of this waterway had the effect of destroying contiguity between the royalty interest for the land encompassed in Unit D and the royalty interest for the land now encompassed in Unit E. The Smith Group argues that there was no use of the mineral interest for the land in Unit E until production began in October 1960, more than ten years after the mineral interest on this land was created in the McSpadden Group, because the Unit D wells were located on non-contiguous lands in or on the north side of the waterway which separated the lands located in Unit E from the lands located in Unit D.
The McSpadden Group argues that the waterway that does exist in Unit D is not a navigable waterway and that, even if some portion of that waterway was navigable, the waterway was not navigable for its entire length across Unit D, so as to destroy the contiguity between the land in Unit D, on which the 1954 and subsequent wells were located, and the lands south of the waterway here in dispute. In further response to the Smith Group's contention that the mineral royalty interest had prescribed for non-use, the McSpadden Group asserts that even if said waterway had been navigable for its entire length and *1034 had extended completely across Unit D, and even if title to that water bottom was vested in the State of Louisiana so as to destroy the contiguity of the two tracts of land, the legal conclusions that the Smith Group would have the court draw from these facts are not valid under the law that governed during the period when prescription had allegedly run, relying upon Crown Central Petroleum Corporation v. Barousse, supra and Montie v. Sabine Royalty Company, 161 So.2d 118 (La.App. 3rd Cir. 1964), writ den. 246 La. 84, 163 So.2d 359 (1964), which held that where part of a royalty tract was within a voluntary unit and part of the royalty tract was outside the unit, production from a well within the unit constitutes use of the entire mineral royalty interest as to the acreage both inside and outside the unit irrespective of whether or not the unit well was on or off the royalty tract.
The McSpadden Group argues that should the waterway in question be navigable and thus owned by the State, separating the royalty tract into two tracts, that during the critical time period (1954 to 1960) production attributable to portions of the royalty tract contained in Unit D, under the law set forth in Crown Central and Montie, interrupted prescription with regard to portions of the royalty tract contained in Unit E. They argue this is so because production from the royalty tract in Unit D was attributable by the then existing jurisprudence to that portion of the royalty tract south of the waterway and was sufficient to interrupt prescription on the royalty tract in Unit E which is south of the waterway in question. They argue that their royalty interest was vested by the decision in Crown Central and Montie long before adoption of the Louisiana Mineral Code or the change of the jurisprudence affected by the Gulf Oil decision, and that this vested interest could not be divested by the change in jurisprudence or by the retroactive application of the present Louisiana Mineral Code.

ISSUE OF NAVIGABILITY
The Smith Group's case fails entirely unless the waterway in question was navigable for the entire width of Unit D, because if it were not, then there would be no question that the royalty interest under the land in Unit E was contiguous to the royalty interest under the land in Unit D on which there had been continuous production since 1954. Such continuous production would thus have interrupted prescription for non-use of the royalty interest on the lands in Unit E.
The law in Louisiana is clear that use of any part of a mineral servitude reserves the servitude in its entirety. Lenard v. Shell Oil Company, 211 La. 265, 29 So.2d 844 (1947). It has long been recognized that although a mineral royalty interest is not a servitude, per se, it is a real right in the nature of a servitude and is subject to the same laws of liberative prescription, including the rule that the use of the part constitutes use of the whole. Vincent v. Bullock, 192 La. 1, 187 So. 35 (1939). Production from one part of a tract burdened by a mineral royalty interrupts prescription as to the entire tract. Exchange Oil & Gas Company v. Foster, 237 So.2d 904 (La.App. 1st Cir.1970), writ den. 256 La. 884, 239 So.2d 541 (1970); Lavergne v. Savoie, 221 So.2d 71 (La.1969). A lack of contiguity between tracts of land subject to one royalty interest is sufficient to defeat an interruption of prescription. See Lee v. Giauque, 154 La. 491, 97 So. 669 (1923); Vincent v. Bullock, supra; Continental Oil Co. v. Landry, 215 La. 518, 41 So.2d 73 (1949); and Whitehall Oil Co., Inc. v. Heard, 197 So.2d 672 (La.App. 3rd Cir.1967), writ den. 250 La. 924, 199 So.2d 923 (1967).
All parties agree that the beds of waterways that were navigable in 1812 and continue to be navigable at this time are owned by the State. See La.Civil Code Article 450; Yiannopoulos, Property, § 46 in 2 La.Civ.L. Treatise 132 (2d ed. 1980). The bed of a waterway which was navigable in 1812 but which is no longer navigable belongs to the State in its capacity as a private person. Wemple v. Eastham, 150 *1035 La. 247, 90 So. 637 (1922). There is also no disagreement between the parties with regard to the ability of a private person, other than the State, to own the beds of waterways that were non-navigable in 1812 and remain non-navigable to the present date. See Smith v. Dixie Oil Co., Inc., 156 La. 691, 101 So. 24 (1924); Yiannopoulos, Property, supra.
The Smith Group claims in this case that the waterway in question was navigable in 1812 and is now navigable and therefore the bed of the waterway is owned by the State. As the Smith Group asserts navigability they must prove navigability because it cannot be presumed. Rue v. Continental Insurance Company, 366 So.2d 629 (La.App. 3rd Cir.1978), writ den. 369 So.2d 153 (La.1979); Guillory v. Bertrand, 375 So.2d 144 (La.App. 3rd Cir. 1979), writ den. 378 So.2d 434 (La. 1979); State ex rel Guste v. Two O'Clock Bayou Land Company, Inc., 365 So.2d 1174 (La. App. 3rd Cir.1978), writ den. 367 So.2d 387 (La.1979).
In an attempt to prove navigability of the waterway, both in 1812 and now, and thus ownership by the State of the bed of the waterway, the Smith Group offered at trial the testimony of two witnesses for the purpose of establishing the navigability in 1812 and at the present time of the waterway traversing Unit D.
The first witness was Mr. William E. Howe. Mr. Howe's qualification as an expert witness was that he was the State Chief of Engineering in the leasing division of the Office of Mineral Resources. Mr. Howe stated that he had never been in Section 19 or 20 of Township 14 South, Range 7 East, Iberia Parish, Louisiana (the area in litigation) and had never seen or made a survey in connection with the problem of navigability of the waterway in question. His testimony was presented for the purpose of showing that the State asserted ownership of the waterway on the basis of navigability. On cross-examination, Mr. Howe revealed that the State's assertion of ownership of the waterway was based on a determination of navigability that was arrived at by merely calculating acreage of waterways as shown on State maps and plats. Mr. Howe had no information as to whether or not any State mineral board employee had ever physically examined the waterway in question as to its actual navigability.
In connection with Mr. Howe's testimony State Lease 500 granted in 1941 to Shell Oil Company was introduced in evidence as covering all State owned beds of waterways in Sections 19 and 20 of Township 14 South, Range 7 East, Iberia Parish, Louisiana as well as many other lands. A copy of a unitization agreement was also introduced which makes reference to 33.26 acres of land in Section 20, Township 14 South, Range 7 East, Iberia Parish in which the State was given credit for 33.26 acres of land in Unit D it claimed to own under the waterway. This was an agreement entered into between Shell Oil Company, the State Mineral Board, and in it the State also recognized that the Smith Group was asserting title to the 33.26 acre area claimed by the State. The McSpadden Group objected to the offer in the event that it was intended to show ownership by the State of the 33.26 acre area under the waterway in question. The Court, in ruling on that objection, permitted the agreement to be entered in evidence to show that a portion of the production from the land in Section 20 would be payable to the State under this agreement but stated that it could not "... conclude that this proves that the 33.26 acres are owned by the State." However, a compromise agreement was offered in evidence by the State and both the defendants-appellants and defendants-appellees, in which the Smith Group as well as the McSpadden Group compromised with the State relative to this 33.26 acres in Section 20 and the State agreed that the royalties from the bed of the waterway in question would be divided 50% to the State and 50% to the Smith Group and the McSpadden Group. As a result, the Smith Group and the McSpadden Group had received royalties from at least one-half of all production attributable to *1036 the bed of the waterway in question until institution of this concursus proceeding.
The other witness offered by the Smith Group on the alleged navigability of the waterway in question was Mr. Jack Stelly. Mr. Stelly's qualifications are that he was a licensed, experienced surveyor, but he was not an engineer, nor was he a hydrologist.
Mr. Stelly was shown a copy of the official plat of Township 14 South, Range 7 East, which does not show any waterway in Section 20. Mr. Stelly testified that the plat only indicated that Section 20 (the area involved in this litigation) was not a surveyed section. He further testified that there was no ancient map to show whether or not there was a waterway in Section 20 in 1812. The earliest evidence Mr. Stelly was able to find that showed the waterway in Section 20 was the geodetic survey quadrangle sheet "Derouen" prepared in 1937 and aerial photographs made in 1935 and 1965. Mr. Stelly stated he had tried to get additional information from the National Archives in Washington, D.C. relative to this section of land but was without success. The only evidence bearing on the issue of present navigability of the waterway is Mr. Stelly's testimony based on his examination of the waterway and adjacent property in 1983. Mr. Stelly visited the waterway in question on one occasion in 1983, along with two other persons, in a 19 foot airboat which drew about 6" of water. He took no measuring tools with him other than an unmarked 1" × 2" board × 8 feet long for pounding on the bottom. He admitted that he did not take soundings across the width of the waterway, that he could not draw a cross section representing the depth across the waterway at any given point, and that his measurements were "eyeballed" as he had no calibrated tool with him for measuring depths. He stated that for the entire length of the waterway, there was nothing but marsh, that there were no towns or signs of human habitation, that he saw no one using the waterway, that the waterway dead-ends in the marsh a short distance from the eastern boundary of Unit D, and that there are no other waterbodies or streams that this waterway joins with at the lower west end. Mr. Stelly testified that the airboat had scraped bottom and that he could not determine whether the obstruction was the bottom or merely a log. Mr. Stelly testified that the airboat was not able to go to the end of the waterway because they were afraid that if they went further they might get stuck. He further testified that they had to get out of the airboat and manually turn it around so it would not get stuck.
Despite this complete lack of factual evidence even as to the existence of this waterbody prior to 1935, the Smith Group claims that this evidence establishes that the waterway was in existence and navigable in 1812 and that this evidence establishes that the waterway is presently navigable.
In Louisiana waterways are navigable in law "... when they are used or susceptible of being used in their natural and ordinary condition as highways for commerce, over which trade and travel are or may be conducted in the customary modes of trade and travel on the water." (Citations omitted.) Ramsey River Road Property Owners v. Reeves, 396 So.2d 873, at page 876 (La.1981).
As the Louisiana Supreme Court stated:
"Navigable means when a stream is large enough to float a boat of some size, engaged in carrying trade. It implies a possibility of transporting men and things. It is because navigable rivers afford a way of communicating that the legislature has placed them in the public domain." (Citation omitted.) Burns v. Crescent Gun and Rod Club, 116 La. 1038, 41 So. 249 at page 251 (1906).
Simply stated, a water course is navigable when by its depth, width and location it is rendered available for commerce. State v. Capdeville, 146 La. 94, 83 So. 421 (1919), cert. den. 252 U.S. 581, 40 S.Ct. 346, 64 L.Ed. 727 (1920).
The trial judge, after hearing the evidence, found that the Smith Group failed to meet their burden of proving the existence *1037 or navigability of the waterway in 1812 or its present navigability at the time of the trial. From the evidence presented we cannot say that the trial judge's finding of fact concerning this waterway was "clearly wrong." Arceneaux v. Domingue, 365 So.2d 1330 (La.1978); Canter v. Koehring Company, 283 So.2d 716 (La. 1973). For this reason the trial court's ruling is affirmed.
As we have affirmed the finding of the trial court that the waterway was not in existence or navigable in 1812 or presently navigable at the date of the trial of the matter it is not necessary for us to reach the issues of whether or not there were vested rights, whether or not the provisions of the Louisiana Mineral Code can be applied retroactively and, if so, whether or not a retroactive application would operate to divest any vested rights.
For the foregoing reasons, the judgment of the trial court is affirmed. All cost of this appeal and of these proceedings are to be borne by the funds placed on deposit in this concursus proceeding by Shell Oil Company.
AFFIRMED.